NOTICE
Decision filed 10/10/23. The
text of this decision may be
changed or corrected prior to
the filing of a Peti ion for
Rehearing or the disposition of
the same.

2023 IL App (5th) 180537

NO. 5-18-0537

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 16-CF-334 |
| | ) | |
| CHRISTIAN REICHERT, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court, with opinion.
Presiding Justice Boie and Justice Welch concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Christian Reichert, appeals the trial court's judgment of guilt, asserting the trial court erred by denying defendant's motion to suppress on the basis that he invoked his right to remain silent. He further contends the trial court erred in allowing the admission of evidence and testimony regarding a shooting that occurred July 30, 2016, that was substantially prejudicial to his case. For the following reasons, we affirm.

¶ 2                              I. BACKGROUND

¶ 3    On July 31, 2016, Officer Trey Harris was shot while attempting to apprehend a tan 2000 Pontiac car, which held four men who shot firearms around Robert Stalls Avenue in Carbondale, Illinois. The original shooting was retaliation for intentional underpayment in a cannabis transaction involving DJ Wright (DJ) and Brandon Jones (Brandon). As a result of this shooting,

in addition to an anonymous tip, officers interviewed defendant in connection with the shooting and other criminal dealings.

¶ 4    On September 1, 2016, a superseding grand jury indicted defendant with conspiracy to possess with intent to deliver cannabis in violation of section 5(g) of the Cannabis Control Act (720 ILCS 550/5(g) (West 2016)) and sections 8-2(a) and 8-2(c)(1)(A) of the Criminal Code of 2012 (720 ILCS 5/8-2(a), (c)(1)(A) (West 2016)) and cannabis trafficking in violation of sections 5.1(a) and 5.1(b) of the Cannabis Control Act (720 ILCS 550/5.1(a), (b) (West 2016)). On March 13, 2017, the State filed a motion to sever defendant from the case, which included defendant and four others (Brandon, Jared Jones (Jared), Alex Karcher, and William Cummins) based on defendant's prior recorded statements describing his and the others defendants' roles in the conspiracy. The motion indicated the State intended to submit defendant's prior statements as evidence in defendant's case. The motion was heard on March 28, 2017, at which time no party objected. Thereafter, the trial court granted the motion to sever.

¶ 5    On May 26, 2017, defendant also filed a motion requesting suppression of his statements made during his police interviews. The motion alleged defendant was not properly advised of his rights prior to questioning and defendant invoked his right to counsel during the questioning but interrogators failed to properly end the interrogations.

¶ 6    On July 5, 2017, after the State provided the defense with the audio and video recording of the interview on August 2, 2016, defendant filed an amended motion to suppress, which listed the same contentions as previously set forth and included an additional claim that defendant asserted his right to remain silent, "but law enforcement ignored his requests and made promises/threats to coerce his statements."

¶ 7    At the hearing on the suppression motion, the State called Alicia Barr, who was a special agent with the Illinois State Police (ISP). Agent Barr became involved with the case following the shooting of Officer Trey Harris. She agreed the shooting was over a drug case rip-off. As part of her investigation, she interviewed defendant on August 2, 2016, August 3, 2016, and August 4, 2016. The August 2, 2016, interview occurred at the Marion Police Department, in Marion, Illinois. Defendant was under arrest and in custody at the time of the interview. Agent Barr stated defendant was advised of his constitutional rights prior to the interview. She read defendant the form while he followed along. He then initialed and signed the form indicating he understood his rights. Agent Barr stated that neither she, nor anyone else, threatened defendant to induce him to make a statement. She stated defendant did not appear to be under the influence of anything or in need of medical attention.

¶ 8    She averred the interview, including defendant's advisement and waiver of his rights, was audio and video recorded. She identified the flash drive containing the interview and stated it contained a recording of the advisement of *Miranda* rights prior to the interview. See *Miranda v. Arizona*, 384 U.S. 436 (1966). She further identified the ISP constitutional rights and waiver of rights document initialed by defendant on August 2, 2016.

¶ 9    Agent Barr stated the interview lasted about 12 hours, off and on. The interview itself was 6½ hours with a lot of down time, during which they obtained search warrants. Agent Barr testified that defendant gave her the impression that he wanted to participate and help in the interview. Numerous breaks were taken, and defendant was offered food and water multiple times.

¶ 10    The State played clips from the video recorded interview. Exhibit 1-C was played for the court and Agent Barr stated in the clip, defendant only indicated that he "wanted to go off the record and continue[d] talking." The agent responded to the request by convincing defendant that

3

it would not be good to go off the record; it would look shady. Neither before, nor after, did defendant tell the agent that he wanted an attorney or that he would not talk. Agent Barr stated that throughout the rest of the day of the interview, defendant indicated numerous times he wanted to continue discussing the matter.

¶ 11    Agent Barr agreed that she used profanity stating, "When I am continually being lied to, it does get aggressive in there." Agent Barr testified that she only remembered defendant stating he wanted to go off the record. She agreed that she attempted to talk defendant out of that decision because "it wouldn't be fair to any of us in that room to go off the record." She denied saying, "Mr. Reichert, if you are saying you don't want to speak to us anymore, then we have to stop here," because he did not want to talk. Rather, the context was that he did not want to talk on the record.

¶ 12    Agent Barr further agreed that she did not take defendant's statement, "I am not saying nothing right now though. I am freaked out. You don't understand" to mean that he did not want to stop talking to her. She stated she took that to mean he was freaked out by the people he was involved with that he purchased the vehicle for; he did not want to talk badly about them because he was afraid of what they would do to him.

¶ 13    On cross-examination, Agent Barr also agreed that—after defendant indicated hesitation in continuing to talk—she probably stated, "You are in f*** deep, Dude. You might as well just help us out so we can help you out." She agreed that she did not stop and confirm whether defendant wanted to stop speaking altogether. It was her impression defendant did not want to speak on the record about the people who came into town and were ultimately responsible for the officer being shot. Defense counsel asked if she ever confirmed after defendant stated, "I don't want to talk. I am not saying nothing right now though" that it meant he wanted to stop talking and

4

invoke his right to remain silent. The agent stated that she inferred the statement "to mean he wanted to stop talking on the record."

¶ 14 The agent stated that one of the reasons she told defendant that she did not want to turn off the recording was because it looked shady; she inferred this was because nobody trusts the police anymore and the police are portrayed as harming defendants when the recordings are off. After that statement by Agent Barr during the interview, defendant stated, "I can't say what I need to say right now. I need to be off the record." She stated she provided him with paper so he could write what he wanted to say so it would not be on audio, but he chose not to do that and continued talking with them. She again agreed that she never stopped and reconfirmed that defendant was not asserting his right to remain silent at any point during this time.

¶ 15 Agent Barr stated the second interview occurred the next day at the Williamson County Sheriff's Department. Prior to the interview, Agent Barr again advised defendant of his rights, in the same manner she did the previous day. She identified the waiver signed by defendant that day and indicated defendant again understood his rights. This interview was also recorded and included the *Miranda* warning provided by Agent Barr. She stated no coercion or threat was used to obtain the executed document.

¶ 16 Agent Barr stated there was also a third interview on August 4, 2016. That interview lasted approximately 2½ hours. Agent Barr testified that defendant was advised of his rights prior to that interview in the same manner as provided the prior two days. She identified the waiver of rights signed by defendant. This document was signed with Agent Barr and Agent Freeman present. Agent Barr also identified a copy of the interview. At the end of the video, defendant was about to go to court, and he indicated that he wanted to talk with a lawyer. No interviewing occurred after that point.

5

¶ 17    The parties provided oral argument the following day. No transcript of those arguments is in the record. On August 11, 2017, the trial court issued an order denying the motion to suppress. The order found, *inter alia*, that defendant indicated that he did not want the interviews recorded, but when the officers indicated the interview would be recorded, defendant continued to talk.

¶ 18    On May 8, 2018, defense counsel filed a motion *in limine* requesting the court exclude all irrelevant evidence and all relevant evidence that was substantially outweighed by the danger of unfair prejudice to include (1) any and all evidence regarding the investigation and or statements, comments, discussions, and/or testimony related to the shooting of Carbondale police officer Harris; (2) any mention of the Lake of Egypt rental home, or in the alternative, a barring of the State classifying the residence as a stash house, drug house, or another prejudicial term; and (3) any and all mention of defendant selling a firearm to any third party. The State filed a response to the motion *in limine* stating the officer shooting was a continuing narrative of the actions of the conspiracy, its scope, and the participation by its members, as well as being relevant and admissible. As to the home, the State argued that the restriction of classifying the home as a stash house or drug house was unfair because that was precisely how it was used. The State's response indicated it had no intention of introducing testimony regarding the sale of any firearm by defendant and had no irrelevant evidence.

¶ 19    The motion *in limine* was argued on June 28, 2018. At the hearing on the motion, counsel contended that the fact that guns were involved and an officer was permanently blinded as a result of the act sways the jury against defendant for reasons other than the evidence of the crime. Following the hearing, the trial court issued an order denying the motion and finding the incident involving the officer shooting was inextricably intertwined with acts in furtherance of the alleged conspiracy and the evidence was a continuing narrative of the events. The court further found the

6

prejudicial effect of the evidence did not substantially outweigh the probative value of the evidence.

¶ 20    The trial began on July 24, 2018. During opening statements, the State first focused on the shooting. It detailed defendant's involvement in procuring the vehicle used in the shooting, the purpose of the shooting to retaliate for underpayment for drugs, and the impact of the shooting on Officer Harris's life. The State explained that the shooting—and an anonymous tip—led police to defendant, who lied in his interviews. Eventually, however, defendant admitted to renting a stash house for Brandon to store his cannabis. The State argued a conspiracy may be implied by defendant's actions in using a fake name to purchase the vehicle in the shooting. The State further argued, "By *** those actions you may infer an agreement that he's trying to collect and retaliate for what happened." Before ending its argument, the State explained that it did not charge defendant with selling drugs or the shooting of Officer Harris. It averred that it charged defendant with "conspiracy to possess with intent to distribute and traffic this marijuana."

¶ 21    The State's first witness was Officer Harris, who stated his last active day on the Carbondale police force was July 31, 2016. He explained it was his last day because he was shot in the head that evening. He addressed the details of the car chase and eventual shooting that occurred on July 31, 2016. He detailed the trajectory of the bullet in his face, the damage caused, and stated the bullet remained in his sinus cavity. He agreed the event was video recorded with the vehicle dash camera. After addressing exhibits from Google maps showing the route, the dash camera video was played for the jury starting from when the officers first saw the tan Pontiac in Carbondale, to the subsequent pursuit, and the eventual shooting of Officer Harris.

¶ 22    Barr testified that she was a sergeant with the ISP assigned to general criminal investigations. She stated that while investigating the officer shooting, she learned that cannabis

7

trafficking was occurring. She clarified that Officer Harris was the officer shot, but she was not involved in the initial response to what happened on Dillinger Road. She was sent to the car fire on Dewmaine Road because they knew it was the same vehicle used in the officer shooting. They were able to determine the car's owner and that the vehicle was recently sold. She also stated the Carbondale Police Department received an anonymous tip that a guy named Christian was hiding with Brandon. They later found out defendant purchased the vehicle and was hiding with Brandon somewhere in Lake of Egypt. After the deputy marshals located defendant, Agent Barr interviewed him over the course of the next three days.

¶ 23      Agent Barr confirmed defendant was taken into custody on August 1, 2016, at his home on 611 S. Virginia Street, in Marion, Illinois. She was told defendant was cooperative and came to the police department.

¶ 24      With regard to the interview, Agent Barr stated it totaled approximately 17 hours over 3 days. Agent Barr agreed defendant waived his right to counsel and told her throughout the interview that it was his intent to assist the officers with their investigation. He also gave consent for the search of the Lake of Egypt property at 854 Power Plant Road in Marion.

¶ 25      Agent Barr testified that the first interview was at the Marion Police Department and was recorded. It started at approximately 12:39 p.m. and ended at 12:44 a.m. the next morning. She testified that defendant waived his *Miranda* rights and lied throughout the interview. For example, he initially stated he did not have a phone but later revealed he did. He further stated that he only owned the Trailblazer and did not know anything about a 2000 tan Pontiac. When defendant finally admitted he bought the Pontiac, he had another story as to why it was purchased. Only later did he explain the "rip-off," which occurred in Carbondale, explaining that DJ was supposed to sell 15 pounds of cannabis for $50,000 to Ronald McConnell.

¶ 26     Agent Barr identified the first day of the interview on the flash drive. The State offered the flash drive as evidence as PE2A. Defense counsel objected, stating he did not know if he should put his objection on the record or in chambers. The jury was dismissed, and counsel stated concerns with the edited video, arguing "a number of the bytes are essentially just a series of inaccurate statements by my client," which had no purpose since the witness already testified that defendant was not cooperative in the beginning. The court overruled the objection and indicated the State could play clips it wished regarding the situation.

¶ 27     The parties returned to the courtroom and the State returned to its direct examination of Agent Barr who identified the video and stated it reflected what occurred that day. The State offered the video as PE2A, and the court admitted the exhibit into evidence. Agent Barr identified the tape from the second day and the State moved to admit it as PE2B. The court asked defense counsel, "Same issue?" and counsel replied, "Same issue, your Honor."

¶ 28     Following Agent Barr's identification of the recording of the third day of the interview, the State offered the video of the third interview, PE2C. The court asked defense counsel, "Same?" and he replied, "Yes, your Honor." The clips of the three days of interview were listed as PE2 and were offered as evidence. The court stated, "Same?" Defense counsel replied, "Same objection."

¶ 29     Thereafter, the clips regarding the first day of the interview were published to the jury. The video included 92 clips, and Agent Barr explained the date and time stamps. The video of the interview revealed—*inter alia*—that defendant went to Oregon with Brandon in June 2016 and in exchange for $100,000 received approximately 100 pounds of cannabis from Brandon's source in Oregon. The $100,000 to purchase the cannabis and, upon purchase, the 100 pounds of cannabis were concealed in the tires of a Jeep, hauled on a trailer to and from Oregon. Defendant averred

9

this was the typical way for Brandon to transport the cannabis, which occurred about once a month. Defendant stated that Xavier Lewis and Karcher also brought cannabis into town.

¶ 30    Defendant stated that he rented the house on 854 Power Plant Road, near Lake of Egypt (lake house). The cannabis transported from Oregon was stored in a garage safe at that residence. He also provided other details—such as how they would store the cannabis and the names of Brandon's buyers.

¶ 31    On July 27, 2016, DJ—one of Brandon's sellers—made a deal to distribute approximately 15 pounds of that cannabis to a customer in Carbondale. Brandon instructed DJ to grab and count the money before handing the cannabis to the buyer. DJ did not do this. After the buyer drove off with the cannabis, the men discovered that the stacks of money had a $100 bill on top and bottom, but the middle of the stacks were all $1 bills. Brandon called for assistance from individuals in Kansas, who met at the Lake of Egypt house on July 29, 2016, with weapons and ammunition and devised a plan to retaliate against the theft. Two of the individuals from Kansas were Lewis and Karcher.

¶ 32    After purchasing the vehicle on July 30, 2016, defendant drove the Pontiac, without plates, to the lake house. The four men from Kansas were at the stash house with DJ, and defendant observed three AR-15 rifles and three handguns on the counter. At that time, he connected the pieces and realized that the men were there to retaliate. On July 31, 2016, the individuals from Kansas were involved in a second drive-by shooting on Robert A. Stalls Avenue, which resulted in a police chase and the shooting of Officer Harris. Defendant claimed it was not about the drugs or money, but Brandon's pride.

¶ 33    Later in the interview, defendant admitted to taking Karcher to steal plates off of another car at a Dollar General in Marion, Illinois, to use on the Pontiac. Defendant asserted that his only involvement was buying the Pontiac and renting the house. He denied selling any drugs.

¶ 34    The video also revealed defendant altering his story several times. Initially, he claimed DJ was the person who asked defendant to rent the lake house and buy the Pontiac. Later, however, he averred Brandon was actually the person who made those demands. Defendant also later revealed that—despite his previous statements to the contrary—he spoke with Brandon on a daily basis, as Brandon checked in on the lake house. Brandon also told defendant about DJ's bad drug deal on July 27, 2016. He also claimed that he did not know for what the lake house was going to be used when he began renting it, did not have a cell phone, provided a different story regarding dropping off the Pontiac, and denied previously meeting any of the four men who came from Kansas to participate in the shooting.

¶ 35    On cross-examination, Agent Barr stated that hundreds of officers were involved in the investigation. To her knowledge, nobody had ever been charged with either the aggravated battery with a firearm or attempted murder of the police officer, but she knew other arrests were made. She agreed some suspects did not give information because they were frightened for their physical safety and that the clips shown did not include defendant telling the officers of his fear for his own safety as well as his family. The agent agreed that defendant specifically stated he was afraid that Brandon and his group were "going to kill my whole family."

¶ 36    Agent Barr agreed the marijuana found at the lake house belonged to Brandon and it was Brandon's money that was used to purchase the marijuana in Oregon. Defendant advised the police that it was Jared's truck that he and Brandon drove to Oregon. They towed a Jeep Crawler on that trip. Agent Barr confirmed defendant did not own the Jeep Crawler. Agent Barr also confirmed

11

defendant returned to southern Illinois in June 2016, after living in Montana or California. Agent Barr further confirmed that as a result of her investigation it was "clear that this was essentially Brandon Jones' operation" and he had been doing this operation for "a couple of years prior to this incident occurring."

¶ 37    With respect to the shooting, Agent Barr acknowledged the rip-off deal was set up by Brandon and DJ. Agent Barr agreed the shooting occurred because of Brandon's pride and "saving face" rather than money or cannabis. She also agreed defendant stated his only connection to Karcher and Lewis was when he met them in Oregon, and they were Brandon's contacts.

¶ 38    Agent Barr further agreed that Brandon made defendant rent the home and put his name on the lease, made defendant buy the car, stored the marijuana at the house in defendant's name, and instructed defendant get the plates for the Pontiac. She agreed Brandon did not want his fingerprints on any of this. She also agreed that Brandon was very good at pawning off liability on third parties. She did not believe that Brandon set defendant up, but that defendant did things for Brandon because of their friendship.

¶ 39    Agent Barr was unaware of defendant making more than one trip to Oregon. She agreed that defendant gave the names and nicknames of Brandon, DJ, Lewis, and Karcher; provided information on the lake house and AR-15 firearms at the lake house that had been modified; and offered to assist officers in luring back Karcher and Lewis to Illinois so police could take them into custody.

¶ 40    On redirect, Agent Barr stated that Brandon and defendant were childhood friends, and she did not believe that Brandon made defendant do anything. She agreed defendant stated that Brandon threatened him, but when asked, defendant did not provide specific statements. She stated

12

that nothing during defendant's interviews indicated that Brandon threatened defendant with violence to perform the acts he completed.

¶ 41    Ray Sutton testified that he was a crime scene investigator for the ISP. He was assigned to assist at Robert A. Stalls Avenue to process a drive-by shooting scene. He described the photographs taken and evidence retrieved at that scene. The evidence included a Pontiac Aztec that was hit by gunfire, a bullet projectile casing, and a dumpster struck by gunfire. He was then advised of a second scene that needed processing where Officer Harris was shot. The scene revealed blood in the roadway and shell casings—including seven Federal .223 rifle casings. Following his work on that scene, Trooper Sutton was called to Dewmaine School Road in Carterville where a burned vehicle was found. There, Trooper Sutton photographed the license plate and vehicle identification number (VIN) tag number to identify the owner. The car was towed to an impound lot. The interior revealed eight shell casings classified as Hornady 9-millimeter Luger and .223 Federal Remington.

¶ 42    On August 2, 2016, Trooper Sutton processed defendant's residence, 611 Virginia Street in Marion, Illinois, pursuant to a search warrant. Photographs from the residence revealed a cell phone, a bed, a white scale, and a large Ziploc baggy containing a green leafy substance.

¶ 43    On August 7, 2016, Trooper Sutton processed a garage and vehicles at 854 Power Plant Road, pursuant to a search warrant based on defendant's interview testimony. Photographs taken by Trooper Sutton revealed a two-axle, flatbed trailer, a piece of luggage with defendant's name, vehicle and all-terrain vehicle tires, a large jack stand, an air compressor, tools, a lawnmower, and a safe. The Jeep crawler had already been removed. Trooper Sutton returned to the residence on August 17, 2016, to search for shell casings in the yard to determine if they matched those found

13

at the Dillinger Road site. Trooper Sutton found three Federal cartridge .223 Remington shell casings and two .380-caliber shell casings in the yard.

¶ 44    On cross-examination, Trooper Sutton stated he was unaware of the occupants of the residence on Virginia Street; he was only advised that it was defendant's residence. He was aware others lived there but did not know their names were Tina Reichert (Tina) and Lonnie Brimer.

¶ 45    Angela Horn, a forensic scientist employed with the ISP Division of Forensic Services, testified that she specialized in firearms and toolmark identification. She examined the seven Federal .223 Remington cartridge cases collected in this case from Dillinger Road and found they were all fired from the same rifle. She also examined the five cartridges obtained from the backyard at 854 Power Plant Road. Three were .223 Remington fired cartridge cases and two were .380 auto cartridge cases. The three .223 Remington fired cartridge cases were identical to the seven from the original scene. Two of those were fired from the same rifle as the seven addressed earlier.

¶ 46    James Mincler, a crime scene investigator with the ISP, identified the photographs he took of the Pontiac and the Carbondale police vehicle. Via the photographs, Mincler identified three circular defects in the windshield of the police vehicle, two graze marks on the hood, and a circular defect on the lower left-hand side of the vehicle. There was also a defect in the sun visor on the passenger side of the vehicle.

¶ 47    Investigator Mincler also took photographs at the residence at 854 Power Plant Road. The pictures included a cabinet with miscellaneous trash bags and heat seal bags, a bag with a leafy green substance, a lid to a plastic Pelican rifle case, a pry bar on the countertop, and wood that was removed from the floor. He stated that a heat sealer was commonly used for the storage of long-term food items and possibly narcotics and other items. The machine would seal the bag and kept the scent and air inside the bag. Where the floor was exposed, there was also a piece of jacketing,

14

which was the shiny part of the bullet. Another photograph revealed the kitchen countertop and sink with nine glasses, which were also collected as evidence for fingerprints and DNA. Those items were given to Master Sergeant Keller.

¶ 48 Additional photographs were taken in the garage. These revealed a lawnmower, a Jeep vehicle, a set of spare tires and rims, and miscellaneous tools. Other photographs from the garage revealed a green leafy substance located on the interior side of the residence at the threshold of the garage and a safe with a keypad, which was opened by fire and rescue, that revealed packages therein. Those items were placed in evidence by the drug task force.

¶ 49 Clark Meadows testified that he was a United States Deputy Marshal. His involvement with the case was to identify the person who purchased the vehicle that was used when the police officer was shot and determine the vehicle's origin. He determined the owner, based on the VIN number, was Ivan Ryan from Ina, Illinois. He learned, after interviewing Ryan, that his father sold the vehicle in Creal Springs. He then interviewed Ryan's father, who identified defendant as the purchaser from a picture. The man also confirmed that defendant was driving a 2004 silver Trailblazer at the time of the purchase, which was the same vehicle owned by defendant at that time.

¶ 50 On cross-examination, Meadows testified that he was assigned to the case by ISP. He explained that when a police officer was shot, all surrounding agencies assist in the investigation. He believed three U.S. Marshals were assigned to the investigation. He had no idea how defendant's name came up as a suspect. He was just told the name and did the legwork to find pictures to show the Ryans.

¶ 51 The State called Ivan Ryan, who testified about the sale of the 2000 Pontiac. He stated that U.S. Marshal Clark Meadows came to talk to him, and Ryan identified the defendant as the

15

purchaser of the car for $2500. He stated that defendant gave a different name when he purchased the car. He thought it was Christian Wright. Ryan testified that defendant was a real nice kid.

¶ 52    The State called Webb Smith, a Carbondale attorney, who explained his role in renting the house at Lake of Egypt. He stated the house was owned by a friend who moved to Florida and could not show the property, so Smith did that for him. The renter contacted him through Craigslist. He testified that he showed the property to defendant, who signed a lease on June 23, 2016. He paid a $3550 deposit, and the rent was $1275 per month.

¶ 53    Curtis Eggemeyer testified that he worked for the ISP and was assigned to the Southern Illinois Drug Task Force. He was involved with the search of the lake house on August 2, 2016. He found 71 individual vacuum-sealed bags in the safe containing cannabis in a freestanding safe in the garage. There was also a small amount in the kitchen cabinet. They also found a vacuum sealer machine. After the cannabis bags were transported to the evidence lab at the ISP, Eggemeyer dusted each bag with fingerprint powder.

¶ 54    Thanarat Viriyakul, employee of the ISP Forensics Laboratory in Metro East, examined the bags found at 854 Power Plant Road. The bags tested positive for cannabis. The amounts examined were in excess of 5000 grams, so he did not analyze the remainder of the evidence.

¶ 55    Amy Hart, an employee for the ISP Metro-East Forensic Science Laboratory, next testified. She reviewed the glassware taken from the lake house. Some of the prints were from Brandon and others were from Karcher. She also examined the fingerprints taken off the cannabis bags. Several of the bags had fingerprints matching Jared.

¶ 56    Further evidence submitted by the State included testimony from Casey Waydright, who worked at Federal Express as a customer service agent. She discussed a package that arrived on November 19, 2015. She thought the package was suspicious, smelled like marijuana, and was

being sent to Oregon, which was one the states they watched for packages because cannabis was legal there. The person shipping the package seemed nervous and stated it was an eBay shipment several times, which was unusual. After the shipper left, the pack was placed to the side, and she advised her coworker that it smelled like marijuana. Pursuant to Federal Express's policy, they opened the package and found a space heater that smelled like marijuana. The grate of the heater was covered with cardboard, so they popped it open and found $55,000 in cash inside the heater. They called the Southern Illinois Enforcement Group (SIEG), which was a drug task force. Waydright identified the photographs of the heater and the video from the day at Federal Express that was played for the jury. On cross-examination, Waydright agreed that she previously babysat defendant as a child but did not recognize him from anything other than that.

¶ 57 The State called Kenneth Sneed, who worked for SIEG. He and Agent Nicholas Dill were called to investigate the package Waydright received at Federal Express. He agreed the package contained $55,000 and smelled of cannabis. He testified that they later had a K-9 check the package, the canine alerted, and they seized the cash.

¶ 58 The State also called Dawn Campbell, who testified that she was the fiancée of Josh Hileman, who moved in with her at the end of December 2014 after being released from prison for burglary. Eventually, around February 2015, she found out Hileman was selling cannabis after she asked how he had money when he was not working. She stated that Hileman initially lied but later told her he was working odd jobs with Jared.

¶ 59 Campbell testified that Hileman was getting his cannabis from Jared, who pressured Hileman to move the product faster. Jared was delivering the cannabis to her house, and Hileman would take it out of her house. Hileman's customers included Justin Phipps, Jordan Key, and

17

Cummins. After the sale, the cash would be turned over to Jared. At first, she would see about a few ounces of cannabis brought to her house, but in the end, it was up to two or three pounds.

¶ 60    Campbell testified that Jared was getting the cannabis from Brandon. Brandon stated he was the boss and could cut everyone off at any time he wanted. Campbell stated that Brandon briefly cut his brother Jared off for a while. She testified to seeing $34,000 on her bed in Johnston City and hearing conversations between Brandon, Jared, and Hileman. She agreed that Hileman was earning a very big portion of the money.

¶ 61    Campbell stated that they also traded cannabis for cars. Some packages were distributed to Cummins for the purchase of Cummins's Corvette, and they also traded marijuana for a Jeep. Campbell testified that Karcher once came with Hileman, Brandon, and Jared to her house to bring the portion of cannabis Hileman was to sell. During their visit, Campbell overhead Brandon talking about cash that was seized from the Federal Express shipment. Brandon stated that the crew would have to work harder. She believed Karcher worked as a transporter of the cannabis.

¶ 62    Campbell testified that the cannabis was coming from Oregon, and she was asked by Jared to collect a load and drive it back. She said she was supposed to pull a backhoe on a trailer that would be loaded with cannabis. She refused but later found out at a bonfire at Brandon's mother's house in October 2015 that a man named Christian was going to make the trip to Oregon.

¶ 63    She was also present during an altercation between Jared and Hileman about not collecting fronted out money. During the altercation, Jared punched Campbell in the face. Hileman stood up and told Jared not to hit her. Jared then hit Hileman until Hileman was not fighting back. Jared then came back and hit Campbell, breaking her jaw. She stated she did not receive medical treatment, because the police would want to press charges and she was concerned about what

18

would happen to her if she pressed charges. She stated that the more she tried to get Hileman away from the situation, the more they threatened that she and her family would be killed.

¶ 64    Campbell testified that after money in a package was seized from Federal Express in November 2015, the cannabis was gone for about four months. Campbell watched the surveillance video from Federal Express and identified Brandon as the person who took the package to Federal Express in November 2015.

¶ 65    On cross-examination, Campbell stated that she was interviewed by Agent Dill around August 17, 2016. She admitted to informing the agent of defendant. She agreed that the only time she met defendant was at the bonfire, and it was her impression that he was going on a trip with Brandon to Oregon because defendant confirmed he would go. She did not know if defendant actually went.

¶ 66    Hileman testified that he served 2½ years of a 6-year sentence for burglary and knew Campbell for about 20 years. When he was released from prison, he was picked up by Jared, Wendy William, and Chandra Jones (Chandra). He stated that he and Jared were best friends, and he was close to Jared's mother, Wendy. He explained that Chandra was Jared and Brandon's sister.

¶ 67    Hileman worked at Triple E Barbeque for about six months but thought it was a waste of time and decided to make his living selling drugs about three months after he moved in with Campbell. He stated that Brandon provided Jared with cannabis, and Jared provided him with the cannabis. Hileman testified that his customers were Cummins, Jim Hayes, Phipps, Jimmy Piersly, and Campbell.

¶ 68    Hileman sold 50 pounds a week of cannabis to Cummins, which equated to two big black garbage bags that were filled with one-pound, vacuum-sealed, packages. He stated that he would sell the marijuana for $3000 and had the ability to lower the price, if necessary, due to competition.

19

He later sold about 100 pounds of cannabis to Cummins weekly. Cummins would hand over the cash at the time the cannabis was delivered. He remembered exchanging cannabis for two cars: a Jeep and a Chrysler 300. Hileman also knew Karcher. He did not know if Karcher was selling cannabis, but as far as he knew, he was still involved with the group.

¶ 69 Hileman stated that the argument that involved Campbell getting her jaw broken started because Jared did not believe Hileman was selling the cannabis and getting the money back to Jared fast enough. Hileman stated that he did feel a little bit threatened. He agreed that Jared broke Campbell's jaw to motivate him to sell quicker. It did not motivate him. He quit for a little bit. He agreed it was a scary experience because these people were capable of violence against him and people he loved.

¶ 70 On redirect, however, Hileman stated he chose to do the things he did and he was not motivated by fear. He stated that he thought Jared and Brandon were his brothers. Hileman stated that he sold approximately 100 pounds of marijuana a week and that included all of his customers. He twice accompanied Jared to the lake house but only went inside the house once. He went into the garage and the living room. Hileman remembered the safe in the garage. He observed Jared open the safe, which was filled with marijuana. The marijuana removed from the safe was sold to Cummins.

¶ 71 On cross-examination, Hileman stated that he was interviewed by Agent Dill and Sheriff Robert Byrd on August 24, 2016, at the Graham Correctional Center. He was only aware of one stash house in the area. He also admitted selling cocaine that he received from Jared. Jared's cocaine also came from Brandon. Hileman was also asked about the flowchart of Brandon's organization that he prepared on August 24, 2016. Hileman testified that to his knowledge, defendant was never involved in the sale of marijuana.

20

¶ 72    The State called Cummins, who testified that he lived in Eldorado, Illinois, and sold vehicles in Harrisburg, Illinois. He admitted that he entered into an agreement with the State prior to providing his testimony. He further stated that the agreement was if he told the truth regarding his role in the conspiracy he would receive four years' probation and pay a fine of $22,000 and costs of almost $12,000. He agreed that he pled guilty to conspiracy to possess with intent to distribute over 5000 grams of cannabis. Thereafter, he sat down immediately with officers and talked about the various purchases and sales he was involved with over the past couple of years.

¶ 73    Cummins's testimony revealed a working relationship with Hileman for five or six years in which he purchased cannabis from Hileman, purchasing increased volumes of cannabis over time. He stated the largest quantity he ever purchased from Hileman was 40 pounds at around $2400 to $2500 per pound. The cannabis was packaged by the pound.

¶ 74    Cummins testified that he knew—other than through the news—that the officer's shooting impacted his ability to get cannabis from Hileman and Jared. He confirmed that five vehicles were traded for cannabis including a Chevrolet Corvette, Chevrolet Tahoe, GMC Yukon, Chrysler 300 SRT8, and Jeep Cherokee. He stated there were a variety of locations for the transactions, including locations in Lake of Egypt and Marion. He vaguely knew Brandon, as he showed up to Hileman's house for one of the cannabis deals. Cummins admitted that he had multiple felony convictions, including drug possession and a burglary sentence in 2009. Since then, his only other felony conviction was for the current case, in which he received probation, and a Saline County marijuana case in which he also received four years' probation that ran concurrent to the other sentence.

¶ 75    Thereafter, the State rested, and defense counsel moved for a directed verdict. Following the court's denial of the motion, jury instructions were presented, and the case was submitted to the jury. The jury found defendant was guilty of both conspiracy to possess with intent to deliver

21

cannabis involving more than 5000 grams of a substance containing cannabis and cannabis trafficking involving more than 5000 grams of a substance containing cannabis. On August 17, 2018, defendant filed a motion for new trial based—*inter alia*—on the denial of his motion *in limine* regarding the shooting of Officer Harris.

¶ 76    On October 19, 2018, the court denied the motion for a new trial. Thereafter, the court sentenced defendant to 15 years on the conspiracy count with 2 years' mandatory supervised release and 23 years on the trafficking count with 3 years' mandatory supervised release.

¶ 77    On October 24, 2018, the State moved to supplement the record pending appeal with an ISP interview of defendant's mother, Tina, conducted on August 16, 2016. While the motion stressed the interview regarded another matter, the interview revealed that one of the individuals from Kansas held a gun to defendant's head and threatened to hurt Tina if he identified them or snitched on them. Additional portions of the interview revealed that defendant stayed with his mother after renting the house and told her not to go there. He was afraid for their safety. Defendant also told his mother to leave her house when he discovered the shooting occurred. The State's motion was granted on October 24, 2018.

¶ 78    On November 7, 2018, defendant filed his direct appeal. The judgment signed by the court on October 24, 2018, was filed with the court on November 19, 2018. An amended notice of appeal was filed November 20, 2018.

¶ 79                                    II. ANALYSIS

¶ 80    On appeal, defendant asserts two arguments. He argues his confession should have been suppressed and requests review of this issue as both plain error and ineffective assistance of counsel. Defendant also contends the trial court committed reversible error in allowing testimony and evidence related to the police officer shooting.

22

¶ 81                                     A. Suppression Issue

¶ 82    To preserve an error for review, the party must object at trial and present the issue in a posttrial motion. *People v. Nelson*, 235 Ill. 2d 386, 436 (2009). Defendant failed to reassert his suppression argument in his posttrial motion and therefore forfeited such issue. *People v. Salamon*, 2022 IL 125722, ¶ 56 (defendant forfeits arguing an error on appeal when the issue was not properly preserved by raising it at trial and in a posttrial motion). Defendant concedes he failed to preserve his argument but requests plain error review.

¶ 83    The plain error doctrine allows reviewing courts to overlook a defendant's forfeiture of an error under two specific circumstances. *People v. Hileman*, 2020 IL App (5th) 170481, ¶ 40. The first step in determining whether plain error applies, however, is determining whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 84    Under the fifth amendment of the United States Constitution, which applies to the states through the fourteenth amendment (U.S. Const., amend. XIV; *People v. Hunt*, 2012 IL 111089, ¶ 23), "[n]o person shall *** be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Because of the inherent compulsion involved during in-custody police questioning, the fifth amendment privilege against self-incrimination extends to custodial police interrogation. See *Miranda*, 384 U.S. at 461-63.

¶ 85    To protect a suspect against self-incrimination from the "inherently compelling pressures" of custodial interrogation, the United States Supreme Court adopted prophylactic measures. *Id.* at 467. These procedural safeguards require officers to inform

> "a suspect before a custodial interrogation that: he has the right to remain silent; anything
> he says can be used against him in a court of law; he has the right to have an attorney
> present; and if he cannot afford an attorney, one will be appointed for him before

23

questioning if he so desires." *Hunt*, 2012 IL 111089, ¶ 25 (citing *Miranda*, 384 U.S. at 479).

¶ 86    In this case, there is no question that the interrogating officers provided *Miranda* warnings to defendant before each interview. However, defendant argues that he invoked his right to remain silent during the interview.

¶ 87    In *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), the United States Supreme Court determined that if police do not scrupulously honor a suspect's invocation of his right to remain silent, any statements obtained as a result must be suppressed. To exclude statements pursuant to *Mosley*, defendant must actually invoke his rights. See *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). In determining whether defendant invoked his right to end questioning we consider both defendant's verbal and nonverbal conduct. See *People v. Flores*, 2014 IL App (1st) 121786, ¶ 37. The invocation must be clear and unambiguous. *Berghuis*, 560 U.S. at 381. The " 'demand to end the interrogation must be specific.' " *People v. Cox*, 2023 IL App (1st) 170761, ¶ 44 (quoting *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005)).

¶ 88    Defendant contends his interview statements of "Can we get off the record then because I'm not going to say anything else on the record. And that's the honest God's truth" and his statement a minute later that "I'm not saying nothing right now though" clearly invoked his right to remain silent. In support, defendant cites *People v. Strong*, 316 Ill. App. 3d 807, 814 (2000), which held defendant's statement that he "did not want to say anything more" was sufficient to unequivocally communicate a desire to remain silent.

¶ 89    Unlike *Strong*, defendant's statement here did not clearly and unambiguously portray that he no longer wanted to speak to police. Rather, he placed a condition on his cooperation with police. The first statement explicitly indicated that defendant did not want to say anything on the

24

record, not that he did not want to speak at all. Defendant concedes that this statement only placed a condition to be met before he would cooperate; however, he contends the second statement provided a clear invocation of his right to silence.

¶ 90    Defendant's second statement—in isolation—may appear to be an intention not to speak, but—viewing the statement in the context of the interaction (see *Davis v. United States*, 512 U.S. 452, 459 (1994) (the invocation must be sufficiently clear such "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney"))[1]—we find defendant again only expressed a condition on his cooperation. Given that the conversation leading up to the second statement revealed defendant's desire to speak off of the record, the "right now" in defendant's second statement referred to the fact that they were still on the record rather than an indication that defendant did not want to speak at that time. Such conclusion is further supported by defendant's action in waving his left hand toward and looking at the audio recorder lying on the table between him and Agent Barr when he stated, "I'm not saying nothing right now though." As such, we find defendant's second statement also indicated that his cooperation was conditioned on being off the record.

¶ 91    Defendant provides no authority for his argument that the constitution required the officers to either agree to the condition or tell defendant they would not agree to the condition and terminate the interrogation. The protections of the constitution apply only when a *clear* and *unequivocal* invocation of the right to remain silent has been made. *Berghuis*, 560 U.S. at 381. While the statements here are not equivocal in the sense that defendant was uncertain, we fail to see how defendant placing a condition on his cooperation unequivocally asserts his wishes to cease

---

[1]Although *Davis* concerns the right to counsel, the standards that apply when determining whether defendant invoked his right to counsel are the same as when determining whether defendant invoked his right to remain silent. *Berghuis*, 560 U.S. at 381.

25

questioning altogether. We further note that the officers were not required to clarify the unequivocal request. See *Davis*, 512 U.S. at 461-62. Looking to the interaction as a whole, we find defendant did not unambiguously invoke his right to remain silent.

¶ 92　Because defendant did not clearly invoke his right to remain silent, there is no error to establish plain error. For the same reason, any motion to suppress on this basis would have been denied, defeating defendant's alternative argument that counsel was ineffective for failing to preserve the issue. See *People v. Rowell*, 2021 IL App (4th) 180819, ¶ 21 (counsel is not ineffective for failing to pursue a meritless motion to suppress).

¶ 93　　　　　　　　　　B. Evidence of the Police Shooting

¶ 94　Defendant also argues that the court erred by allowing evidence of the shooting of Officer Harris based on relevancy and Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). The admissibility of evidence is entrusted to the sound discretion of the trial court, and its determination will be reversed only for an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12.

¶ 95　Evidence that is irrelevant is inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 96　Pertinent to this issue, the State needed to prove that defendant made an agreement with one or more persons to commit possession with the intent to distribute, with the intent that such offense be committed, and he or another co-conspirator committed an act in furtherance of that agreement. 720 ILCS 5/8-2 (West 2016). Where independent evidence establishes a *prima facie* showing of the conspiracy, a co-conspirator's acts and declarations in furtherance of the conspiracy

26

can be used as substantive evidence. *People v. Goodman*, 81 Ill. 2d 278, 283 (1980); *People v. Sauer*, 177 Ill. App. 3d 870, 876 (1988).

¶ 97    Defendant contends because he was charged with conspiracy to possess cannabis with the intent to deliver, and not conspiracy to commit a violent act or shoot an officer, the shooting of Officer Harris was irrelevant. He explains that the shooting occurred after the conspiracy to distribute the cannabis was completed and without relation to it. The shooting did not aid the conspiracy in possessing, delivering, or selling cannabis.

¶ 98    In support of his position, defendant cites *People v. Cassler*, 332 Ill. 207, 208 (1928), where the defendant and co-conspirators, Loren Patrick and Lillian Frazier (Lillian), were charged with the first degree murder of William Lindstrom. Lillian, her husband Joseph Frazier (Joseph), defendant, and defendant's husband were friends. *Id.* at 208-09. Lillian later left Joseph to live with Lindstrom. *Id.* at 209. Eventually, Lillian wanted to leave Lindstrom and asked defendant "how she could be freed from Lindstrom." *Id.*

¶ 99    Lillian testified that defendant brought her poison and suggested she put it in Lindstrom's food. *Id.* The package of poison was never opened, but defendant later asked if Lindstrom was insured. *Id.* Defendant also told Lillian that she knew a man who would make Lindstrom's death appear as an accident so that the insurance could be collected. *Id.* Such man was Patrick, who previously lived with defendant and her husband. *Id.* at 208-09. According to Lillian, the three co-conspirators met and discussed different plans to kill Lindstrom. *Id.* at 209-10.

¶ 100   Lillian and Patrick were present during the murder. *Id.* at 210-11. Defendant was parked in a car nearby. *Id.* at 211. Once it was complete, defendant drove the car to the rear of the building, and all three co-conspirators moved Lindstrom's body to the floor of the car and defendant drove away. *Id.* A few days later, with the help of Joseph, Lillian went to defendant's home in Indiana.

27

*Id.* at 212. Defendant and Lillian "discussed the trip of Patrick and plaintiff in error to Crown Point after the killing of Lindstrom, the disposition of the iron pipe and the blanket, the possibility of finger prints, the report of Lindstrom's absence by Mrs. Frazier, and the necessity of preventing her discovery." *Id.* A couple days later, defendant and Patrick took Lillian to work for a man in a different town in Indiana. *Id.*

¶ 101   Lillian testified that there was no understanding or agreement that defendant would share the proceeds of the insurance policy for Lindstrom. *Id.* at 212. Joseph testified that defendant handed him a letter from his wife asking him to destroy certain documents and photographs relating to his real estate. *Id.* at 213-14.

¶ 102   The Illinois Supreme Court found that Joseph's testimony that his wife and defendant requested he destroy certain letters and photographs related to real estate which he and his wife owned "in no way connected [defendant] with the conspiracy to murder." *Id.* at 218. It also found Lillian's testimony regarding her movements subsequent to the murder also had no relation to defendant or "concern the furtherance of any conspiracy." *Id.* It reasoned that testimony indicating defendant helped Lillian after the murder was a separate offense of being an accessory after the fact and could not support making defendant a principal in the murder charge. *Id.* at 219. It noted that "evidence of a distinct and substantive offense is irrelevant and inadmissible." *Id.*

¶ 103   We find defendant has an overly narrow view of what constitutes acts in furtherance of a conspiracy. A conspiracy is not limited to that charged in the indictment. See *People v. Hedge*, 284 Ill. 513, 516-17 (1918).

¶ 104   For example, in a subsequent Illinois Supreme Court case, *People v. Kliner*, 185 Ill. 2d 81, 98 (1998), defendant was convicted of two counts of first degree murder and one count of conspiracy to commit murder of Dana Rinaldi. Co-conspirator Joseph Rinaldi (Rinaldi) testified

28

that he had several meetings with defendant and another man, Michael Permanian, to devise a plan to kill Rinaldi's wife. *Id.* at 137. Rinaldi testified that in some meetings, defendant agreed to murder Rinaldi's wife for a portion of the insurance proceeds. *Id.* Rinaldi testified that after the murder, Permanian also made threats—on behalf of himself and defendant—to Rinaldi in efforts to obtain the insurance proceeds, including a payment schedule and discussion of converting traveler's checks into cash. *Id.* Despite the charges being related only to murder, the court determined that the conspiracy did not end with the murder and encompassed obtaining the insurance proceeds. *Id.* at 143. Therefore, the "statements were made in the course of the conspiracy and to advance the ultimate goal of the conspiracy." *Id.* at 143-44.

¶ 105 Accordingly, while isolated statements in *Cassler* support defendant's position, *Kliner* demonstrates the nature and scope of the conspiracy may be larger than that alleged in the indictment. The fact the defendant was not charged with the shooting, or a violent act, is not determinative.

¶ 106 Where " 'the agreements between the conspirators represent stages or different functions to be performed in the formulation of a larger scheme, the object of which is to effectuate a single unlawful result, then there is a single conspiracy.' " *Sauer*, 177 Ill. App. 3d at 879 (quoting *United States v. Napue*, 834 F.2d 1311, 1332 (7th Cir. 1987)). "[T]he mere fact that separate overt acts have been committed in furtherance of a single conspiracy does not create a new conspiracy." *People v. Burleson*, 50 Ill. App. 3d 629, 633 (1977). Moreover, an act in furtherance of the conspiracy "does not necessarily have to involve one of the elements of the object offense." *People v. Ambrose*, 28 Ill. App. 3d 627, 631 (1975).

¶ 107 The evidence here demonstrated a continuous drug scheme with a clear hierarchy. This hierarchy included persons in Oregon who provided cannabis to Brandon, who then provided

29

cannabis to lower-level dealers in southern Illinois to sell. Despite defendant's argument that the conspiracy ended when the cannabis was delivered on July 27, 2016, the evidence at trial showed that the conspiracy involved a broader objective to distribute cannabis than a one-time deal. Also, Cummins's testimony that his purchases from the conspiracy ceased after the shooting and the cannabis found in the lake house after the shooting suggests the conspiracy of possession with the intent to distribute was in existence during the shooting.

¶ 108 The evidence established the shooting was in retaliation for the conspiracy's drug deal gone bad. The shooting evidence also demonstrated how the conspiracy functioned and defendant's role in the conspiracy to be an inconspicuous face when the enterprise needed to obtain means from the public—without raising concerns—to effectuate the goals of the enterprise. We therefore find the admission of the shooting was relevant to and in furtherance of the conspiracy.

¶ 109 While defendant disputes only the shooting of Officer Harris, such act was a direct result of the initial shooting that Officer Harris investigated. Concealment of the crime, where sufficiently proximate in time to the offense, is considered "occurring during the course of the conspiracy." *Kliner*, 185 Ill. 2d at 141; see *People v. Thomas*, 178 Ill. 2d 215, 238 (1997).[2] The co-conspirators shot at Officer Harris to evade capture for an act made in furtherance of the conspiracy and avoid exposing the conspiracy. As such, we cannot say the court abused its discretion in finding the shooting of Officer Harris was relevant to and in furtherance of the conspiracy.

¶ 110 Defendant also contends the evidence should have been excluded pursuant to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). Under such rule, relevant evidence "may be excluded if its

---

[2]We acknowledge this caselaw makes such statement in discussing the co-conspirator hearsay exception. However, we find such caselaw instructive, as it speaks to what constitutes "in furtherance of the conspiracy."

30

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*

¶ 111    "If the evidence is prejudicial such that it serves only to arouse and influence the emotions of the jury, it is error to submit it to the jury." *People v. Burrell*, 228 Ill. App. 3d 133, 144 (1992). "All evidence is prejudicial in the sense that it compels the factfinder in one direction or the other; the issue posed by Rule 403 is when it becomes unfair[ly] so." (Internal quotation marks omitted.) *People v. Woodson*, 2023 IL App (1st) 191353, ¶ 101. "Unfair prejudice" is a term that " 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.' " *People v. Parker*, 335 Ill. App. 3d 474, 487-88 (2002) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

¶ 112    Evidence that the shooting resulted in injury to an officer does not cast defendant in a negative light that would have nothing to do with the case. Defendant's argument that the evidence was meant to lump defendant together with the most heinous of his co-conspirators ignores that the nature of conspiracy and conspiracy charges is to make all co-conspirators liable for any acts in furtherance of the conspiracy, whether completed by all co-conspirators or one. See *People v. Cooper*, 194 Ill. 2d 419, 434-35 (2000) (all who engage in a common criminal design or agreement are equally responsible for the acts made by any party to the agreement and in furtherance of the agreement); *People v. Caraga*, 2018 IL App (1st) 170123, ¶¶ 44, 54 (same).

¶ 113    Despite defendant's argument that evidence of the shooting of Officer Harris had no relevancy, as explained above, the evidence was admissible as an act in furtherance of the charged conspiracy and therefore probative of an element of the offense. Evidence of the shooting also

demonstrated the course of conduct that led to the apprehension of defendant and provides context as to why defendant spontaneously made admissions.

¶ 114   With respect to the evidence's prejudicial impact, we note there was no indication that defendant was a principal actor in the shooting, and the State admitted the identity of the shooters were unknown. There of course is prejudice involved in aiding and affiliating with those who shot at police officers; however, unfair prejudice is an insufficient basis to exclude evidence, rather the danger of such prejudice must *substantially* outweigh the probative value. *People v. Prather*, 2012 IL App (2d) 111104, ¶ 24. Because defendant mistakenly concludes evidence of the shooting of Officer Harris was irrelevant, he fails to explain the balancing of the probative value versus any prejudice. Given the probative value of the evidence, we cannot say the court's ruling that the evidence's probative value was not substantially outweighed by the danger of undue prejudice was "arbitrary, fanciful, or unreasonable."

¶ 115   Defendant also argues the State presented the evidence in a prejudicial manner. Indeed, evidence of the lasting impact of the shooting on Officer Harris provides little to no value in proving the conspiracy to possess with the intent to distribute or the cannabis trafficking charge and served only to arouse the emotions of the jury. However, defendant did not properly preserve these arguments.

¶ 116   To properly preserve an issue for review, a defendant need not raise an "identical" argument as that raised at trial. *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). A claim is not forfeited where the court had an "opportunity to review the same essential claim." *Id.* Defendant filed a motion *in limine* to exclude all irrelevant and prejudicial evidence of the shooting of Officer Harris. This presents a general objection to admit evidence of the shooting of Officer Harris, as a whole, and fails to specify why all or any specific part of the evidence was irrelevant or unduly

32

prejudicial. At the hearing on the motion, defense counsel's arguments again concerned reference to the shooting of Officer Harris as a whole. See *People ex rel. Shipton v. Dunleith & Dubuque Bridge Co.*, 322 Ill. 99, 115 (1926) (party forfeits any "specific objections not made or included in any general objection raised to the evidence"). We do not find this broad objection is essentially the same as a more specific claim relating only to the impact of the shooting on Officer Harris or the manner in which the State presented the evidence.

¶ 117 Defense counsel made no objection to any reference to the impact of the shooting on Officer Harris's life or the extent to which the State presented evidence of the shooting. Even assuming defense counsel's argument at the hearing on the defense's motion for a new trial encompassed the more specific claims by stating the "reality of [Officer Harris's] injury and the reality of the fact he got shot could have been minimized," raising such argument for the first time in the posttrial motion was insufficient to properly preserve the issue for review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)); *People v. McDaniel*, 125 Ill. App. 3d 694, 700 (1984). Because the trial court was not timely presented with such argument, defendant forfeits it. Furthermore, defendant has not sought application of the plain error doctrine on appeal and therefore forfeited review of this issue on appeal. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").[3]

---

[3]We would be remiss in failing to note that while the court did not know the extent of the shooting evidence the State would present when it ruled on the defendant's motion *in limine*, the State knew—before trial—of its intention to highlight the impact of the shooting on Officer Harris's life. As explained above, such evidence is improper, undoubtedly aroused the emotions of the jury, and risked the jury convicting defendant based on retribution for the officer rather than based on the evidence before it. We remind the

¶ 118                      III. CONCLUSION

¶ 119   Because defendant's conditional statements did not unambiguously invoke his right to remain silent, his claims of plain error and ineffective assistance of counsel on that basis fail. Evidence of the shooting was relevant and admissible under Rule 403; any error in presenting such evidence was forfeited. Accordingly, we affirm the trial court's judgment.

¶ 120   Affirmed.

---

State that it has a duty to ensure the fairness of a trial and seek the truth. *People v. Valdery*, 65 Ill. App. 3d 375, 378 (1978). This duty should not be "clouded by [a] desire to secure a conviction." *People v. Acker*, 127 Ill. App. 2d 283, 295 (1970).

34

*People v. Reichert*, 2023 IL App (5th) 180537

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, No. 16-CF-334; the Hon. Ralph R. Bloodworth III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, Daniel R. Janowski, and Richard J. Whitney, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Joseph A. Cervantez, State's Attorney, of Murphysboro (Patrick Delfino, Patrick D. Daly, and Michael R. Lennix, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |