2024 IL App (1st) 220821-U

No. 1-22-0821

Order filed May 3, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 2711 |
| | ) | |
| MICHAEL TAYLOR, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justice Tailor concurred in the judgment.
Justice Hyman dissented.

**ORDER**

¶ 1    *Held*:  Trial court's denial of defendant's motion to suppress statements affirmed where the trial court's factual findings were not against the manifest weight of the evidence and defendant's motion to suppress was properly denied as a matter of law where the police did not ignore defendant's invocation of his right to remain silent and his inculpatory statements were voluntary.

¶ 2    Following a bench trial, defendant Michael Taylor was convicted of attempted murder while personally discharging a firearm and unlawful use of a weapon by a felon. He was sentenced

as a Class X offender to 45 years' imprisonment. On appeal, defendant contends that the trial court erred in denying his motion to suppress his statements when the detectives repeatedly questioned him despite his repeated attempts to remain silent and consequently obtained statements that contributed to his guilty verdict. For the following reasons, we affirm.

¶ 3    As defendant only appeals the denial of his pretrial motion to suppress, we will confine our discussion of the facts to those relevant in that determination. The circumstances leading to defendant's arrest were the result of a shooting that occurred on October 29, 2015.

¶ 4    Defendant filed a motion to suppress statements in April 2019. In the motion, defendant argued that his statements to the police should be suppressed because: 1) the statements were the product of "psychological coercion" where he was held in custody for many hours, told the police he would not speak with them, and the police continued to interrogate him and 2) he was unable to understand his *Miranda* warnings because he was under the influence of alcohol and ecstasy. A hearing was held on defendant's motion on October 7, 2019.

¶ 5    At the hearing, Chicago Police Sergeant Matthew O'Brien testified that on October 29, 2015, at approximately 8:55 p.m., he was on patrol with his partner Officer Ali near the Altgeld Gardens housing complex. He heard a call over the radio of a person shot at 13153 South Ellis, which is in Altgeld Gardens, and he drove to that address. When they arrived, the officers found bystanders assisting the victim Willie Grant. A second dispatch indicated that Altgeld Gardens security officers were chasing the offenders near the Bishop Ford Expressway (I-94), and that the chase ended in a crash. O'Brien and Ali went to the expressway and saw the Altgeld Gardens security guards near the crash at a wooded area south of the Beaubien Woods ramp involving a Buick sedan. O'Brien learned from the guards that the occupants of the Buick were the shooters,

security chased them down the expressway, and that after the crash, one of the occupants from the driver's side ran up the embankment to the expressway to cross it and the front passenger ran into the wooded area. The officers decided to search the wooded area with flashlights. O'Brien described the area as a marshland because it was "up against" the Calumet River. They found defendant after about five minutes- he was lying face down on his stomach in the mud and grass with his body flush to the ground. Defendant was handcuffed and brought to his feet. O'Brien identified defendant in court as the person he found in the woods. O'Brien testified that during the walk to the car, he did not observe any signs that defendant was impaired- defendant had no trouble standing and O'Brien did not notice a strong odor of alcohol on defendant. Defendant was between the two officers, who all supported each other because the mud made them slip and slide as they walked. After exiting the marshy area, defendant was able to walk on his own and was subsequently placed in the squad car without any assistance. Defendant sat up inside the car without falling or laying down and never expressed that he needed help or that he was drunk or high. O'Brien indicated that defendant complained of being cold and wet and he was given dry clothes at the police station.

¶ 6     After defendant's arrest, O'Brien viewed video surveillance footage from Altgeld Gardens that captured the shooting. The video showed a person wearing a white shirt, identified in court as defendant, exit the front passenger seat of the Buick prior to the shooting. The same person got back into the front passenger seat after the shooting, and the crashed vehicle was the same as that shown in the video.

¶ 7     On cross-examination, O'Brien testified that they searched the marsh for approximately five minutes before finding defendant lying on his stomach. Defendant was handcuffed on the

ground and escorted out of the wet area by both officers, one on each side of him with linked arms. O'Brien also stated that he had prior experience with defendant. He acknowledged that the video footage of the fleeing Buick showed four people exiting the car, but the security guards did not say anything about the other two individuals.

¶ 8 On re-cross examination, O'Brien testified that he was familiar with defendant and his criminal history because he had arrested him before- defendant had been arrested nine times previously.

¶ 9 Chicago police detective Fred Hasenfeng testified that he was assigned to investigate Willie Grant's shooting on October 29, 2015, and went to the scene just after midnight. At approximately 3:30 a.m. on October 30, 2015, Hasenfeng went to the police station and learned that a suspect was in custody. He identified defendant in court as that suspect. At the station, Hasenfeng and his partner Detective Michael Bernichio met with defendant in an interview room. Bernichio read *Miranda* warnings to defendant from the Fraternal Order of Police (FOP) book and defendant indicated that he understood after each warning was read. Defendant was sitting up and made direct eye contact during that time and did not appear to be drunk or high. Defendant agreed to talk to the officers, and they asked him what happened. During that initial interview, defendant told Hasenfeng that the last thing he remembered was buying his daughter a coat. When they asked defendant why he ran and hid, defendant then said that he did not want to talk anymore. The officers left the room after telling defendant that they would be right outside the door and he could knock if he needed anything. The entire interview lasted approximately five minutes. Hasenfeng returned to the interview room alone at approximately 4:55 a.m. to check on defendant and see if he needed water, food or to use the restroom. Hasenfeng asked defendant where he lived

or was staying and defendant stated that he lived near 66th and Loomis. Hasenfeng asked defendant other questions but defendant stopped talking. Hasenfeng left the room at approximately 5:05 a.m. and did not interview defendant again for another 14 hours. However, during that time, he and other officers checked on defendant periodically, at least every hour. If defendant asked for water, a snack or something to eat, it was provided to him right away, as were bathroom privileges. Hasenfeng also testified that while defendant was held in the interview room, police continued to investigate the shooting, crime scene and other evidence.

¶ 10    The next attempt to interview defendant occurred at approximately 6:41 p.m. on October 30, 2015, with Assistant State's Attorney (ASA) Kosoko present. ASA Kosoko Mirandized defendant from memory and defendant responded that he understood everything. Hasenfeng and ASA Kosoko then questioned defendant and learned that at the time of the shooting he was intoxicated from ecstasy and alcohol. Defendant also stated that he got out of the car with a gun but did not shoot anyone. After saying a few times that he did not shoot or shoot the man, defendant stopped responding to any more questions and turned his head away. Defendant did not appear to be in any distress and did not smell of alcohol. That interview ended at approximately 7:05 p.m. Hasenfeng testified that defendant was allowed to sleep if he wanted to while in the interview room, and that he never promised or threatened defendant to get him to talk.

¶ 11    On cross-examination, Hasenfeng testified that while he was unsure if a log existed to document officers that checked on defendant while he was in the interview room, it was standard procedure to check at least every hour if not a few times per hour.

¶ 12    Seargeant Nicholas Cortesi testified that on October 29, 2015, he was assigned to assist in the investigation of a shooting at 13153 South Ellis Avenue. He was aware that defendant was in

custody and was a suspect in Grant's shooting. Cortesi identified defendant in court. On October 30, 2015, he was part of the team that assisted with the investigation and part of the team that routinely checked on defendant while he was in custody. At approximately 7:30 p.m. that day he checked on defendant, offering him food or drink. Defendant asked for a bottle of water and a candy bar, which Cortesi provided. Defendant asked to speak to him, and Cortesi requested that ASA Kosoko join him in the interview room. ASA Kosoko Mirandized defendant, who indicated that he understood each of those rights and agreed to speak with Cortesi and ASA Kosoko. Cortesi testified that defendant did not appear to be intoxicated in any way and exhibited no signs of being under the influence. During the interview, defendant stated that he thought Grant supplied guns to a rival gang that killed defendant's brother and admitted that he was in the car that pulled up next to Grant. Defendant further stated that he was affiliated with the Black Disciples street gang, he had a brief conversation with Grant, and admitted to shooting at Grant while Grant was on the ground. But defendant did not think he shot Grant because he was shooting at the ground. Additionally, defendant stated that there was no intention to kill Grant but just to send him a message. Cortesi showed defendant a picture of a .9 millimeter handgun, and asked if that was gun defendant fired. Cortesi testified that the gun was found alongside I-94 along the path that the vehicle fled after the shooting. Defendant said it was not the gun he used; he used a .357 revolver, which was subsequently found alongside I-94 as well. Defendant told them that he was sitting in the front passenger seat and had thrown his gun out of the car as they fled. During the interview, defendant put his head own and muttered "I'm f*cked, I'm f*cked." Defendant also muttered that he was going to "take the minimum," "take the 26." Defendant told Cortesi that he would think about documenting his statement.

¶ 13    At approximately 6:20 a.m. on October 31, 2015, defendant asked to speak to Cortesi about documenting his statement. Cortesi and ASA Kosoko interviewed defendant, and Cortesi showed defendant a still photo from the video of the shooting. Defendant identified himself as the individual in the white shirt that got out of the front passenger seat of the car and then reentered the front passenger side after the shooting. Defendant again stated that he was not trying to kill Grant and that he shot at the ground. Cortesi stated that it was not mandatory in 2015 for statements to be recorded, so defendant had to consent, and he did not agree to record his statement in any way. After the interview, defendant was given McDonald's to eat.

¶ 14    At approximately 8:15 a.m. on October 31, 2015, Cortesi and ASA Kosoko went in to speak with defendant again. Cortesi showed defendant another photo from the video of the shooting and defendant again identified himself in the photo. Defendant again stated that he would not agree to document his statement in any way. He also told Cortesi that at the time of the shooting he had drank alcohol and used ecstasy, but never stated that he was still high or intoxicated. Cortesi further stated that between the times of defendant's two statements, he never said that he did not want to talk; rather the conversation just ended and Cortesi went back a few hours later. Defendant was taken to the bathroom when he requested and also given food when he requested it.

¶ 15    On cross-examination, Cortesi confirmed that defendant was at the police station for approximately 23 hours when he was given the bottle of water and a candy bar. While Cortesi had not noted in his general progress report (GPR) that defendant refused to memorialize his statements, he reiterated that defendant refused to have his statements memorialized.

¶ 16    On re-cross examination, Cortesi testified that he documented in his GPR that defendant declined food and drink prior to and after the 6:20 a.m. interview on October 31, 2015, and

defendant chose to speak with him at that time. Additionally, the GPR indicated that Cortesi explained to defendant that if he consented, ASA Kosoko would return and take a handwritten or recorded statement.

¶ 17    The trial court found that the State met its burden by a preponderance of the evidence and showed that the statements were not involuntary because defendant was high or intoxicated or that defendant was denied food, drink and bathroom privileges. Defendant rested without presenting any testimony.

¶ 18    Ultimately the trial court denied defendant's motion to suppress statements finding that the officers' testimony was credible and any impeachment was relatively minor concerning the contents of the GPR.

¶ 19    The case subsequently proceeded to a simultaneous but separate bench trial with codefendant Darrell Pickett.[1]

¶ 20    Grant testified he was on his way to visit a friend in Altgeld Gardens when the shooting occurred. He was walking towards his friend's home when a brown Buick with tinted windows pulled up to him. The front passenger let down the window and Grant asked him "What's to you?" and the passenger pulled out a gun. Grant stated that he was watching the car because it was going very slow before stopping, which put him on alert. Grant identified defendant in court as the front passenger in the Buick. Grant dropped to the ground when he heard more than 10 gunshots and was on his elbows and knees trying to crawl away. Ultimately, Grant was shot seven times: his right wrist, his ribs, his leg and his back. After the gunfire stopped, he heard car doors slamming and the car pulled off. Grant also saw the security car chase the Buick, and other people in the area

---

[1] We will only recite evidence presented with respect to defendant Taylor.

arrived at the scene. Grant was taken to the hospital where he was treated and had surgery because of his injuries. Police interviewed Grant in the hospital at approximately 8:15 a.m. on October 31, 2015, however, he was on Toradol at the time which made him groggy and he was sleeping on and off. Because of that, Grant was unable to recall signing any documents or circling individuals on the photo arrays he was shown at that time.

¶ 21    Mark Washington testified that on the night of the shooting, he worked as a security guard in Altgeld Gardens. He and his partner were in the process of a shift change when he heard 10 to 15 gunshots nearby. They got back into their security vehicle and drove towards the shots, which took approximately 10 to 12 seconds. Washington saw a Buick exiting the complex driving very fast and people standing outside were pointing towards the Buick. Washington and his partner followed the car and eventually got behind it as 130th and Ellis when it stopped at a red light. Washington pulled up to the driver's side of the Buick and activated his lights and sirens. The windows were tinted so he could not see inside. As soon as Washington activated his lights and sirens, the Buick sped away and the guards followed the Buick to the I-94 expressway. Washington saw two things thrown from the Buick's passenger side into the grass on the shoulder as they travelled on the expressway. The Buick exited at Beubien Woods, which is a dead end exit, and because it was going so fast, it lost control, crashed into the gate and "jumped" into the grassy area before stopping. Washington saw one person exit and run back towards the expressway while another passenger ran to the wooded area. He was not able to see either of them clearly. Washington and his partner called in the chase to dispatch and eventually Chicago police arrived on the scene. After searching the wooded area, he saw police handcuff the person they found there.

Washington gave a statement about the incident on October 30, 2015, and went to the police station on November 2, 2015, to view a photo array but he was unable to identify anyone.

¶ 22    Washington's partner David Cross testified substantially similar to Washington. When the Buick crashed, Cross saw the driver exit and run up the embankment and the passenger ran into the woods. When the police arrived and arrested the person from the woods, Cross saw that it was the passenger of the Buick because he was wearing the same clothes.

¶ 23    Sergeant O'Brien testified substantially similar to his testimony at the hearing on defendant's motion to suppress. O'Brien further testified that when he and his partner brought the handcuffed man from the woods, Cross identified defendant as the man who ran from the crashed Buick into the woods.

¶ 24    Officer Cynthia Cirello testified that she and a partner were working on patrol on October 29, 2015. At approximately 9 p.m., she received a call of a person shot at 13153 South Ellis, and headed that way. However, before she reached that address, another call came in with further information, namely that Altgeld security guards said that guns were thrown out of a suspect vehicle in the southbound lanes of I-94, south of the 130th Street exit. Cirello and her partner relocated to that area, exited their vehicle and started to search. Her partner subsequently found a .9 millimeter semiautomatic gun on the shoulder of the expressway and they notified the dispatch. They waited with the gun until an evidence technician arrived and inventoried it.

¶ 25    Cortesi also testified substantially similar to his testimony at the hearing on defendant's motion to suppress. He further testified that during the 7:30 p.m. interview on October 30, 2015, defendant told him that he believed the victim had something to do with his brother's 2007 death either directly or indirectly by supplying guns to an opposition gang faction known as the Bar

Nuns. Defendant told him that he was in Altgeld Gardens on the night of the shooting and that he was originally from there or frequented the area. Defendant was inside a vehicle and saw Grant. The driver "rolled" next to Grant, defendant's window was down and Grant looked over at defendant and said, "What's up?" Defendant indicated that he responded by asking Grant "Why do you got to be hanging with those ni**as?" Cortesi asked defendant who he was referring to and defendant indicated the Bar Nuns. Defendant also indicated that he was a member of the Black Disciples from the Altgeld Gardens area. Defendant then admitted that he exited the vehicle armed with a gun and shot at the ground in Grant's direction to send a message to Grant. Defendant told Cortesi that there were four occupants of the vehicle and further that he did not think anyone else shot at Grant, which Cortesi challenged based on the video footage.

¶ 26    The parties entered into several stipulations regarding the recovered firearms and shell casings.

¶ 27    Officer Kenneth LeFlore, an evidence technician, testified that on October 29, 2015, at approximately 11:15 p.m. he received an assignment to go collect a firearm that was recovered from the southbound shoulder of I-94. LeFlore also went to other locations to take photographs, including the site of the crash and the area where there shooting occurred.

¶ 28    Former ASA Ahmed Kosoko testified that he reviewed the video of the shooting and spoke with detectives prior to ever speaking with defendant on October 30, 2015. He identified defendant in court and stated that he went to speak with defendant to find out defendant's motive for the shooting. Specifically, Kosoko asked defendant why he shot Grant and defendant stated that Grant was a gun runner for an opposing gang and one of the guns was used to shoot his brother, so his gang retaliated against Grant for that. Defendant told him that after the shooting they fled onto the

expressway, tossed the guns out onto the expressway and after the crash, he ran into the wooded water area because he was high and drunk. Kosoko corroborated testimony that defendant was dismayed and that he stated he would go to prison for 26 years. Kosoko wanted to memorialize defendant's statement, but defendant refused both a recorded and written statement.

¶ 29    On cross-examination, Kosoko indicated that he initially spoke with defendant at approximately 8 a.m. on October 30, 2015, at which time defendant stated that he was high on ecstasy and intoxicated at the time of the shooting.

¶ 30    The parties stipulated that Grant was taken to the emergency room at Christ Hospital with eight gunshot wounds: one to his right chest, one to his left palm, two to his left shin, one to his left chest, one to his left hand, one to his lower back and one to his left buttocks. Grant also had multiple bullet fragments in his left lower leg and other areas of his body as well as fractures from gunshots all over his body. Grant had surgery over the night and early morning hours of October 29-30, 2015, where he was intubated, a plate and multiple screws were inserted in his wrist and hand to stabilize a fracture. Grant was discharged from the hospital on November 3, 2015.

¶ 31    At the close of the evidence, the trial court reviewed the evidence presented at trial, noting that the complaining witness testified and that his testimony was corroborated by the surveillance video which showed all four occupants of the car shooting at Grant. The court found the security guards, the former ASA and the officers were credible witnesses. The trial court also noted defendant's admissions, that he was caught a short distance from the vehicle involved in the shooting and that defendant was identified by the officers. The trial court found that although Grant was unable to identify defendant in October 2015, it was not dispositive of the case. Defendant was found guilty on all counts on May 21, 2021.

¶ 32    While defense counsel filed a motion for new trial, defendant changed attorneys during posttrial proceedings. Defendant's amended motion for new trial was filed on November 19, 2021, arguing that: 1) the trial court erred in denying his motion to suppress statements, 2) the State failed to prove him guilty beyond a reasonable doubt; 3) the finding of guilt was against the weight of the evidence; 4) defendant was denied due process of law and equal protection of the laws; 5) the State failed to prove every material allegation of the offense beyond a reasonable doubt; 6) the trial court erred in denying defendant's motion for a directed finding at the close of the State's evidence; and 7) defendant did not receive a fair trial. The trial court denied defendant's motion after argument.

¶ 33    Defendant's sentencing hearing was held on May 9, 2022. The State presented evidence in aggravation of defendant's prior offenses and that he was on parole when the October 2015 shooting occurred. He was ultimately sentenced on May 20, 2022, as a Class X offender to 45 years' imprisonment with three years' mandatory supervised release for attempted first degree murder and a concurrent term of seven years for possession of a firearm while on mandatory supervised release. Defendant's motion to reconsider sentence was denied and his timely notice of appeal followed on May 23, 2022.

¶ 34                                    ANALYSIS

¶ 35    We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 36    On appeal, defendant contends that the trial court erred in denying his motion to suppress his statements when the detectives questioned him despite his repeated attempts to remain silent

and consequently obtained statements that contributed to his guilty verdict. He argues that his right to remain silent was rendered meaningless by the detectives who informed him of that right, and the pressure the police exerted on him rendered his consequent statements coerced. Defendant also contends that he made inculpatory statements after being held for approximately 23 hours locked alone in an interrogation room. He maintains that because the State violated his right to remain silent and that the continued questioning rendered his statement coerced, the trial court erred by denying his motion to suppress. Defendant concludes that because the admission of his inculpatory statements was not harmless beyond a reasonable doubt, this Court should suppress those statements and reverse and remand for a new trial.

¶ 37    Review of a trial court's ruling on a motion to suppress presents both questions of law and fact. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). When reviewing a trial court's denial of a motion to suppress, we apply the bifurcated standard announced by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and adopted by our supreme court in *In re G.O.*, 191 Ill. 2d 37, 49-50 (2000). Under this standard, we give great deference to the trial court's findings of fact and will only reverse those findings if they are against the manifest weight of the evidence, but we review *de novo* the ultimate legal question of whether, based on those facts, the denial of the motion to suppress was proper. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). Further, we note that it is the function of the trial court to determine the credibility of the witnesses and to resolve any conflicts in their testimony. *People v. Melock*, 149 Ill. 2d 423, 432 (1992).

¶ 38    Defendant contends that his invocations of his right to remain silent were unequivocal and ignored. Defendant points to several points during his time in the interrogation room that he states show that he invoked his right to silence. Namely, during the first interview when he told

Hasenfeng that he did not want to talk anymore and at 4:55 a.m. when Hasenfeng reentered the room and did not provide new *Miranda* warnings and defendant looked right at Hasenfeng and looked away. Defendant also contends that he was coerced into making statements because his prior invocation of his right to remain silent was not honored. Specifically, when he was interrogated after 21 hours in custody and his rights had been previously disregarded, defendant admitted that he was present but did not shoot anyone, but then refused to answer further questions; and at 7:30 p.m. on October 30, 2015, when he asked to speak with Cortesi and made the inculpatory statements used at trial. Defendant is essentially making two arguments, one that he invoked his right to remain silent and was ignored, and two, that his later inculpatory statement was coerced after he was held in an interrogation room for 23 hours.

¶ 39    Both the federal and the Illinois constitutions prohibit the state from compelling an individual to be a witness against himself in a criminal prosecution. U.S. Const. amend. V; Ill. Const. 1970, art. I, § 10. To protect this right, it is axiomatic that once an "individual indicates in any manner at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *People v. Edwards*, 301 Ill. App. 3d 966, 977 (1998) (citing *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)). Any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. *Miranda*, 384 U.S. at 474.

¶ 40    However, a statement made as a result of a custodial interrogation is admissible, if after being advised of *Miranda* rights, the suspect voluntarily waives his rights prior to making the statement. *People v. Smith*, 333 Ill. App. 3d 622, 629 (2002). Even if a suspect agrees to talk to authorities, the interrogation must cease if he indicates in any manner prior to or during questioning

that he wishes to remain silent. *Miranda*, 384 U.S. at 444-45. Under these circumstances, the interrogation may be resumed and any statement resulting from renewed questioning is admissible only if the suspect's right to remain silent was "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

¶ 41　To exclude statements pursuant to *Mosley*, a defendant must actually invoke his rights. *People v. Reichert*, 2023 IL App (5th) 180537, ¶ 87. In determining whether defendant invoked his right to end questioning we consider both defendant's verbal and nonverbal conduct. *Id.* An invocation of the right to remain silent must be unambiguous, unequivocal and clear. *People v.. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). The demand to end the interrogation must be specific. *Reichert*, 2023 IL App (5th) 180537, ¶ 87; *People v. Cox*, 2023 IL App (1st) 170761, ¶ 44.

¶ 42　As noted, Detectives Hasenfeng and Bernichio conducted the first interview of defendant at approximately 3:30 a.m. on October 30, 2015, which was about four hours after defendant's arrest. Defendant was Mirandized and defendant indicated that the last thing he remembered was buying a coat for his daughter. When questioned about running and hiding, defendant stated that he did not want to talk anymore. The record indicates that all questioning of defendant immediately ceased and the detectives left the room. The total interview time was five minutes. Hasenfeng came back to the interview room and asked the defendant some general questions at approximately 4:55 a.m., which defendant answered. Hasenfeng testified that he asked defendant "other questions" which defendant did not answer; he just stopped talking. This questioning took a total of 10 minutes, and Hasenfeng left afterwards. The record does not indicate what the other questions were.

¶ 43   We find that defendant unequivocally invoked his right to remain silent during the initial 3:30 a.m. questioning when he said he did not want to talk anymore. We also find that the police did not ignore defendant's invocation of that right- the questioning ceased at that point and the officers left the room.

¶ 44   However, during the 4:55 a.m. questioning, the record indicates only that Hasenfeng asked defendant general questions such as his address. While defendant declined to answer some of Hasenfeng's questions at that time, there was no evidence presented to suggest that such questioning was an interrogation. An interrogation refers to express questioning, as well as to any words or actions on the part of the police, other than those normally accompanying arrest and custody that the police should know are reasonably likely to elicit an incriminating response from the suspect. *People v. Hernandez*, 2017 IL App (1st) 150575, ¶ 116 (citing *People v. Jackson*, 374 Ill. App. 3d 93, 106 (2007)).  The circumstances presented surrounding the 4:55 a.m. questioning do not establish that any interrogation occurred where general questions were asked that were not likely to elicit an incriminating response from defendant. Although there were "other" questions asked that defendant did not respond to, there was no evidence presented at the hearing on the motion to suppress or at trial that suggested such questions were interrogation for purposes of *Miranda*. See *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.). Moreover, the questioning ceased when the defendant stopped talking, and the officer left the room.

¶ 45   The next interview occurred at 6:41 p.m. where the defendant was Mirandized and spoke with officers. In this interview, defendant was questioned more about the circumstances involving

the offense, thus it was an interrogation. He answered some questions before becoming nonresponsive and turning his head away after approximately 24 minutes of questioning. When the defendant became nonresponsive, questioning ceased, and the officer and ASA left the room.

¶ 46    In *Mosley,* 423 U.S. at 102-03, the United States Supreme Court clarified that *Miranda* did not create a *per se* proscription against any further questioning by any police officer, on any topic once the suspect invokes his right to remain silent. Rather, the Court concluded that the admissibility of statements obtained after the defendant decides to remain silent depends upon whether the defendant's "right to cut off questioning was 'scrupulously honored.'" *Id.* In deciding this question, courts should consider whether: (1) the police immediately halted the initial interrogation after the defendant invoked his right to remain silent; (2) a significant amount of time elapsed between the interrogations; (3) a fresh set of *Miranda* warnings were given prior to the second interrogation; and (4) the second interrogation addressed a crime that was not the subject of the first interrogation. *Id.* at 104-05.

¶ 47    Here, the record established that once defendant became nonresponsive during the interrogation, the police immediately halted questioning; this second interrogation occurred 16 hours after the first interrogation; and defendant received new *Miranda* warnings before questioning began. Although defendant was questioned about the same crime, during this second interrogation, this fact alone does not preclude a finding that the defendant's right to remain silent was scrupulously honored. *People v. Nielson*, 187 Ill. 2d 271, 287 (1999) (citing *People v. Foster*, 119 Ill.2 d 69-86-87 (1987)). Thus, under the facts presented here, defendant's right to remain silent was scrupulously honored.

¶ 48    Regarding the 7:30 p.m. questioning on October 30, 2015, and the 6:20 a.m. questioning on October 31, 2015, the record establishes that defendant initiated those conversations with police and the ASA. As such, there is no issue of whether defendant invoked his right to remain silent during those periods of questioning. Instead, defendant claims that his inculpatory statements made during those sessions were coerced due to the amount of time he had been held in custody and his lack of food. We reject defendant's contention.

¶ 49    As noted above, admitting an involuntary confession into evidence violates the fifth amendment to the United States Constitution (U.S. Const., amend. V) and the Illinois Constitution (Ill. Const.1970, art. I, § 10). *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005). In determining whether a defendant's confession was voluntary, we must consider the totality of the circumstances. *People v. Strong*, 316 Ill. App. 3d 807, 813 (2000). Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; and any physical or mental abuse by police, including the existence of threats or promises. *Id.* No single factor is dispositive. *Id.* The ultimate test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome. *Id.*

¶ 50    Police coercion is a prerequisite to finding that a confession was involuntary. *People v. Salamon*, 2022 IL 125722, ¶ 83. Additionally, the duration of a suspect's detention is just one factor included in the totality-of-the-circumstances test. *Id.* ¶ 94.

¶ 51    At the time of the shooting, defendant was 26 years old and had numerous previous contacts with the criminal justice system; in fact, he was on parole at the time of the shooting. While he stated to police that he was drunk and high on ecstasy at the time of the shooting, all of the officers

testified that defendant did not appear to be drunk or high during his arrest or subsequent questioning at the station. Defendant has not alleged any physical or mental abuse by police, so we do not consider those factors. The officers' unrefuted testimony was that defendant was allowed to sleep, he was allowed to use the bathroom when he requested, and although he rejected food several times while in custody, he was given food when he requested it. Defendant was Mirandized twice before he gave the inculpatory statements and had initiated the conversations with police when the statements were given. The record does not indicate, nor does defendant argue, that he was denied access to a telephone to call an attorney or family member.

¶ 52    Additionally, the length of defendant's detention was not so lengthy as to suggest that his inculpatory statements were coerced. The total timeframe from defendant's arrest to his inculpatory statements was less than 24 hours. While there is no bright-line rule in Illinois regarding the allowable length of an interrogation (*People v. Green*, 2014 IL App (3d) 120522, ¶ 61), courts have found confessions to be voluntary despite longer periods in custody than that of the defendant in this case. See *People v. Nicholas*, 218 Ill. 2d 104, 116, 120 (35 hours); *People v. Macias*, 371 Ill. App. 3d 632, 642 (2007) (57 hours).

¶ 53    As stated above, the record indicates that defendant was arrested at approximately 9:00 p.m. on October 29, 2015, and he made the first inculpatory statement less than 24 hours later. Thus, defendant was not held for an excessive period of time before he made inculpatory statements, which, as previously noted, is just one factor to consider when determining whether a statement was voluntary. It cannot be reasonably argued that his detention was too lengthy and thus led to his statements being coerced. We therefore reject defendant's claim of coercion.

¶ 54    The record also indicates that when Cortesi checked on defendant again at 7:30 p.m. on October 30, 2015, and gave him water and a candy bar as requested, defendant initiated a conversation with Cortesi. Cortesi got ASA Kosoko to join, who again Mirandized defendant. Defendant subsequently made inculpatory statements, namely providing a motive for the shooting, admitting that he shot at the ground towards the victim, and indicating what type of gun he had. The following morning at 6:20 a.m. defendant again initiated a conversation with Cortesi and ASA Kosoko regarding documenting his statement. During this conversation as well as the last one at 8:15 a.m., defendant identified himself in still photos from the video footage. The record does not support defendant's claim that his voluntary statements given to police after he initiated conversation with them after being Mirandized were somehow coerced due to lack of food. Under the totality-of-the-circumstances test, we cannot say that the circumstances presented here support defendant's claim that his inculpatory statements were involuntary.

¶ 55    The dissent uses *Salamon*, 2022 IL 125722, ¶ 95, to establish a bright line test of 24 hours in custody to constitute a more "subtle form of police coercion." However, the circumstances presented in *Salamon* are distinguishable from those in the case at bar. The *Salamon* case involved a determination of the reasonable time in custody when a defendant expressly invoked his right to contact an attorney and was denied use of the telephone to do so prior to reinitiating contact with officers and ultimately making inculpatory, post-*Miranda* statements. See *Salamon*, 2022 IL 125722, ¶¶ 98- 103.  After 24 hours in custody, during which the defendant immediately and consistently invoked his right to counsel, the police prevented him from exercising that right. *Id.* ¶ 104. Our supreme  court found that denial of the defendant's post-arrest access to telephone for 24 hours violated his statutory right to communicate with counsel and family, which made his

post-*Miranda* inculpatory statement at the police station after he re-initiated contact with officers involuntary. *Id.* ¶ 110. We further note that our supreme court in *Salamon* found the error to be harmless under the circumstances presented in that case. *Id.* ¶ 128.

¶ 56    Those are not the same or even similar circumstances presented in the case at bar. This was not an unlawful detention used to coerce a *Miranda* waiver and confession out of a suspect who has retained counsel. *People v. Mrdjenovich*, 2023 IL App (1st) 191699, ¶ 117. Rather, it was a lawful detention based on probable cause: defendant was arrested after fleeing from the scene of a shooting leading to a high speed chase and being found hiding in a nearby marsh. Moreover, this case involves only the questions of whether defendant continually and unequivocally invoked a post-arrest silence during his detention at the police station and whether that right was violated when he re-initiated contact with police and made inculpatory statements about the shooting. Defendant did not allege, either during the circuit court proceedings or on appeal, that he ever invoked his right to an attorney, was denied use of the phone, was told that he could use the phone after he cooperated, was handcuffed during interrogation, or was confronted with an express threat of incommunicado detention. Additionally, the officers continued to investigate the offense during defendant's lawful detention, including, securing and viewing video of the shooting and interviewing witnesses. To require officers to abandon legitimate attempts to obtain voluntary statements in less than 24 hours, regardless of the circumstances, would create an "irrational obstacle to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan v. Mosely*, 423 U.S. 96, 102 (1975) Also, as in Mosely, at the very outset of each interrogation subjected defendant to only a

brief period of initial questioning, and suspended questioning entirely for a significant period before beginning the interrogation that led to his incriminating statement." *Id*. at 107.

¶ 57 Our review of the circumstances presented in this case surrounding defendant's invocation of his right to remain silent, and the voluntariness of defendant's statements establish that the trial court's factual findings on the motion to suppress were not against the manifest weight of the evidence. We further conclude that defendant's motion to suppress was properly denied as a matter of law where the police did not ignore his invocation of his right to remain silent and where his inculpatory statements were voluntary.

¶ 58                                          CONCLUSION

¶ 59 The judgment of the circuit court of Cook County is affirmed.

¶ 60 Affirmed.

¶ 61 HYMAN, J., dissenting:

¶ 62 Unless protected and respected by the courts, cherished individual rights and freedoms can be diluted or worse. As U.S. Supreme Court Justice George Sutherland cautioned, "The saddest epitaph which can be carved in memory of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time." *Associated Press v. NLRB*, 301 U.S. 103, 141 (1937) (Sutherland, J., dissenting). The majority has added further vulnerability to an individual's exercise of the legal prerogative to remain silent, an essential right that continues throughout every stage of a criminal proceeding. See *Griffin v. California*, 380 U.S. 609, 615 (1965) (holding fifth and fourteenth amendments forbid prosecution to comment on accused's silence and forbids court from instructing jurors that silence is evidence of guilt).

¶ 63    At issue is whether detectives "scrupulously" honored Taylor's invocation of the right to stop police questioning. That did not happen. The facts show the detectives used coercive tactics to circumvent Taylor's right to conclude interrogation, undermining his ability to receive a fair trial. See *People v. Salamon*, 2022 IL 125722, ¶ 76 (observing that rule prohibiting admission of an involuntary confession is rooted in self-incrimination clause of fifth amendment and due process clause of fourteenth amendment). The more weakened the right, the easier its abuse.

¶ 64    Police locked Taylor inside an interrogation room for more than 30 hours, "check[ing] on him" "at least every hour, if not a couple times per hour," as night became day, day became night, and night became day again. See *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (after *Miranda* rights invoked, police must "scrupulously honor" right to cut off questioning).

¶ 65    To scrupulously honor the right to end questioning means the person in custody, not law enforcement, "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103-06. In *Mosley,* no more than six hours passed between three key moments: (i) an "early afternoon" arrest, (ii) the defendant's invocation of this right 20 minutes into the initial interrogation, and (iii) the final interrogation two hours later. *Id.* at 97-98, 104-05. During this time, the twice-Mirandized defendant went from one interrogation room to a cell block and finally to a new interrogation room. *Id.* A new officer interrogated him about a different crime in that third room. *Id*.

¶ 66    The majority's analysis strips away *Mosley*'s context and recasts its holding as an abstract four-factor test. In the majority's view, courts ask whether (i) officers immediately stopped questioning after the defendant's invocation, (ii) a significant amount of time elapsed between interrogations, (iii) officers gave a fresh set of *Miranda* warnings, and (iv) the next interrogation

addressed a different crime. *Supra* ¶ 48. But, lost in the majority's analysis is the sweep of time detectives described at the hearing on Taylor's motion to suppress.

¶ 67    Taylor was arrested around 9:13 p.m. on October 29, 2015, and two days later, around 8:15 a.m. on October 31, 2015, he participated in the final interrogation. He spent most of this time locked in one interrogation room in which detectives admittedly "check[ed] on" Taylor—"at least every hour, if not a couple times per hour." A hospital room might be periodically checked depending on the condition of the patient, not an arrestee locked in an interrogation room who has invoked his *Miranda* rights.

¶ 68    Context matters because context shapes facts. Detectives first interrogated Taylor around 3:30 a.m., nearly six hours after his arrest. Having been Mirandized, Taylor invoked his right to cut off questioning *within five minutes*, but detectives never left him alone. One of the detectives who first interrogated Taylor admitted reappearing in the interrogation room about 80 minutes later to ask Taylor demographic questions until Taylor's silence over the next 10 minutes drove the detective away. See *People v. Nielson*, 187 Ill. 2d. 271, 287 (1999) (physically conveying desire to cut off questioning permissible where officer "interpreted defendant's conduct" as a "desire to terminate the interview").

¶ 69    But only for a short time. Again, detectives admittedly "check[ed] on" Taylor—"at least every hour, if not a couple times per hour." Doing so was choreographed and deliberate, or, as Taylor contends, psychological coercion. "[C]ustodial interrogation [is] ordinarily conducted by officers who are acutely aware of the potentially incriminatory nature of the disclosures sought[.]" (Internal quotations omitted.) *People v. R.C.*, 108 Ill. 2d 349, 354-55 (1985) (citing *Minnesota v. Murphy*, 465 U.S. 420 (1984)). And "the custodial setting is thought to contain inherently

compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (Internal quotations omitted.) *R.C.*, 108 Ill. 2d at 354-55 (same).

¶ 70 The majority's focus on context-free factors trammels these basic truths. It overlooks how our supreme court has "proscribed more subtle forms of police coercion, including psychological pressure." *Salamon*, 2022 IL 125722, ¶ 83.

¶ 71 What Taylor endured after invoking his rights dishonored *Mosley*'s holding that officers scrupulously honor an invocation of the right to cut off questioning. See *Mosley*, 423 U.S. at 103-06. So, little wonder Taylor's first admissions occurred around 24 hours after his arrest, as the sun had risen and set, but Taylor remained locked in a room without a night's uninterrupted sleep. See *Salamon*, 2022 IL 125722, ¶ 103 (noting "coercive impact of holding defendant, while handcuffed to the wall, in a locked interrogation room for 24 hours without any ability to communicate with the outside world").

¶ 72 I would find the trial court erred by denying Taylor's motion to suppress and remand for a new trial. The State has not proven on appeal that its use of his confession was harmless beyond a reasonable doubt. Generally, "for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *People v. St. Pierre*, 122 Ill. 2d 95, 113-14 (1988). As Taylor stresses, the State's sole eyewitness, the shooting victim, offered a years-delayed identification, and the State had no DNA, gunshot residue, or fingerprints tying Taylor to the shooting. Thus, though surveillance video captured a birds-eye view of the shooting, the State pressed on Taylor's confession in closing argument, which the trial court naturally fastened to in finding Taylor guilty.

¶ 73    Instead of "stretch[ing] forth a saving hand," the majority's decision legitimizes the police's handling of Michael Taylor's invocation of his *Miranda* rights; police in Illinois now can apply the same coercive behavior to others, thereby adding to the repertoire of subversion of the right to remain silent.

¶ 74    I respectfully but resolutely dissent.