NOTICE
Decision filed 01/31/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 241012-U

NOS. 5-24-1012, 5-24-1015 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ABIGAIL A. and ASHER A., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 20-JA-68, 21-JA-76 |
| v. | ) | |
| | ) | |
| Jena A., | ) | Honorable |
| | ) | Matthew D. Lee, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not abuse its discretion by admitting evidence related to respondent's mental health where such evidence provided a baseline from which to determine whether respondent made reasonable progress during the requisite periods, and its fitness finding was not against the manifest weight of the evidence.

¶ 2     Respondent, Jena A., appeals the trial court's August 15, 2024, order finding her unfit as well as the September 19, 2024, order addressing the children's best interests and terminating her parental rights. On appeal, she argues that the trial court's admission of mental health evidence at the fitness hearing was an abuse of discretion. She further argues that the trial court's fitness findings were against the manifest weight of the evidence. For the following reasons, we disagree.

1

¶ 3                              I. BACKGROUND

¶ 4      Jena and Steven[1] are the biological parents of Asher, born August 8, 2020, and Abigail,

born September 21, 2021. The State filed a four-count complaint against Jena and Steven four days

after Asher's birth.[2] Count I alleged Asher's environment was injurious to his welfare by residing

with Jena, who failed to correct the conditions which resulted in prior adjudications of parental

unfitness (705 ILCS 405/2-3(1)(b) (West 2018)). Count II alleged the minor was neglected due to

an injurious environment caused by his exposure to the effects of Jena's mental disability (*id.*).

Count III alleged that Asher was a dependent minor who was without proper care due to Jena's

mental disability (*id.* § 2-4(1)(b)). Following the adjudicatory and dispositional hearings, the court

found the State proved counts I and II and it would be contrary to the health, safety, and best

interest of Asher to remain in the custody of either Jena or Steven. Both parents appealed the

decisions, and the Fourth District affirmed the decisions. *In re A.A.*, 2021 IL App (4th) 200647-U,

¶ 31.

¶ 5      That decision, as well as the record on appeal, contain numerous facts relevant to the case

at bar. First, Jena has a long history of mental health issues. Second, Jena was already on the radar

of the Department of Children and Family Services (DCFS) before this case arose. In 2011, G.V.

was removed from her care, and her two older children, W.M. and S.M., had already been removed.

See *In re G.V.*, 2011 IL App (4th) 110320-U, ¶¶ 6-8. Ultimately, Jena lost her parental rights to all

three of those children.

¶ 6      Thereafter, Jena and her ex-husband moved to Texas where they had two more children,

Hugh and Rosalee. Jena's ex-husband was convicted of assault. While he was incarcerated,

---

[1]Steven is not a party to this appeal. Information related to him included in this decision is provided solely for context in Jena's appeal.

[2]The State dismissed count IV prior to the adjudicatory hearing and therefore it is not addressed.

Rosalee, aged 17 months at the time, drowned in the tub while in Jena's care. *In re A.A.*, 2021 IL App (4th) 200647-U, ¶ 7. After being convicted for the child's death, Jena surrendered the care of Hugh. *Id.* She was sentenced to nine years' imprisonment, served five, and was placed on mandatory supervised release until 2024. The terms of her supervised release precluded her from being a caregiver to any child under 18 years of age and required her to continue therapy.

¶ 7    For these reasons, DCFS took custody of Asher following his birth and recommended the following services for Jena: individual counseling, domestic violence classes, parenting classes, mental health assessment, provide past and current mental health records, visitation, and compliance with supervised release. Jena began counseling with Brooke DiBello in December 2020. Parenting classes were completed by the parents in December 2020. Jena completed her domestic violence class in December 2020. On March 26, 2021, the court issued a permanency order finding that Jena made reasonable efforts and progress in returning Asher home. Jena was directed to attend a mental health evaluation in the dispositional order. On April 26, 2021, Ms. DiBello reported that Jena stated that if Asher was not returned to her, Jena would blow up buildings in Champaign.

¶ 8    Pursuant to the court order, Jena presented to Dr. Figueroa on May 7, 2021, for a mental health evaluation. Jena refused to complete the evaluation and stated that Dr. Figueroa was unqualified to perform the evaluation. She also failed to keep the May 21, 2021, appointment and advised that she would not proceed with the assessment until she obtained a new attorney. On June 24, 2021, the court issued a permanency order finding Jena made reasonable efforts and progress and stated she needed to complete her services.

¶ 9    On August 4, 2021, Judy Osgood evaluated Jena at the request of DCFS, for a psychological evaluation and a parenting capacity assessment. The report reiterated the history set

3

forth above and indicated that Jena presented to the exam as extremely angry, paranoid, and defensive. She was also confrontational and argumentative with Dr. Osgood. Ultimately, Jena signed a consent for the evaluation, which found she could not act appropriately and provided recommendations regarding parenting, including supervised visitation. With regard to the assessment related to Jena's harm to herself or others, the report stated:

> "Jena appears to have severe underlying rage she is projecting onto DCFS staff and visit staff. She was reported to engage in severe anger aggression and rage with intimidation and harassment of case staff and visit staff. She also appeared to be emboldened by her attorney to engage in intimidation, manipulation, and harassment of DCFS staff. It is strongly recommended all professionals involved in their case understand the severity of Jena's mental illness and her potential to act on homicidal and suicidal ideations, especially in the context of a psychotic break."

Due to the extent of her underlying rage, the report opined that Jena appeared "capable of engaging in acts of blowing up buildings and possibly harming others by rationalization of her actions."

¶ 10    As for Jena's capacity to parent, the report stated that Jena had

> "severe and chronic mental disorders including untreated Bipolar I Disorder (with psychotic features), PTSD, neurodevelopmental disorder and Autism. Jena has never demonstrated the ability to safely and responsibly parent a child. *** Jena does not present with the ability and/or willingness to provide her child appropriate medical care with no indication she would meet his educational and developmental needs."

The report also considered Jena a flight risk if Asher was returned.

¶ 11    Abigail, Jena's seventh child, was born on September 21, 2021. On September 24, 2021, DCFS filed a permanency report noting that Asher had been in substitute care for 406 days. The report also noted Dr. DiBello stated that a report would be issued on August 30, 2021, but no report was received. Copies of Dr. Osgood's reports were filed with the permanency report.

¶ 12    On October 13, 2021, the State filed a two-count petition for adjudication of wardship involving Abigail alleging that Jena and Steven failed to correct the conditions that brought Asher into care and that Abigail was neglected due to an environment injurious to her health by both parents due to Jena's mental health condition. At the shelter care hearing on October 19, 2021, the parents stipulated to DCFS taking custody and the court found probable cause.

¶ 13    On December 2, 2021, DCFS filed an updated permanency report. Asher had been in care for 478 days. The report included the details as to Abigail coming into care after Jena tried to conceal that she had given birth. It took six days for them to find the child. Steven was arrested after warrants were issued due to the concealment. At the December 2, 2021, visitation, Abigail's head was hit on the rocking chair. On December 16, 2021, the trial court issued a permanency order finding that Jena made reasonable efforts, but did not make reasonable and substantial progress toward reunification.

¶ 14    On April 22, 2022, the parties stipulated to count I of the State's petition in Abigail's case and count II was dismissed. On July 6, 2022, there was an altercation between Steven and a security guard at the DCFS office where visitation took place. On July 7, 2022, an altercation involving both parents occurred. On July 13, 2022, an altercation occurred between both parents and one of the Addus Home Care (Addus) workers.[3] Visitation was suspended. Jena revoked her consent that previously allowed DCFS to receive information about her counseling with Dr. DiBello. In

_____

[3]Addus is a subcontractor for DCFS that assists with visitation between the parents and children.

5

September 2022, Jena stopped attending individual counseling with Dr. DiBello. On October 4, 2022, the court issued a dispositional order in Abigail's case finding that both parents were unfit because of repeated behaviors that demonstrated the effects of mental illness that kept them from safely caring for Abigail.

¶ 15     From July 2022 and November 2022, visits were moved to the Champaign Police Department due to the previous altercations. In November, DCFS reached out to Jena's counselor, Ms. DiBello, who again confirmed there was no consent in the file and therefore Ms. DiBello could not provide the agency with information regarding the counseling sessions. Steven had an altercation with an Addus worker on December 21, 2022, and his visits were again suspended. Although Jena's visitation was not suspended, she failed to attend the January visitation. A family meeting was called by DCFS, but Jena and Steven's lawyers canceled the meeting. DCFS reached out to Jena's attorney regarding the consent form, but counsel was not helpful. Jena did not reestablish visitation until March 2023 and Steven resumed visitation in April 2023. As of June 2023, there was still no consent for Jena's counseling records.

¶ 16     On January 25, 2023, the State filed a petition requesting the court find the parents were unfit and terminate their parental rights. The State alleged the parents were unfit, pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)), for failure to make reasonable progress toward the return of both children during the period from April 25, 2022, through January 25, 2023 (count I). On September 13, 2023, the State filed a supplemental motion to terminate alleging three additional counts: failure to make reasonable efforts to correct conditions that led to the respective child's removal pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)) during the periods from December 12, 2022, through September 12, 2023 (count II); failure to make reasonable progress toward reunification pursuant to section 1(D)(m)(ii)

6

of the Adoption Act (*id.* § 1(D)(m)(ii)) for the period from December 12, 2022, through September 12, 2023 (count III); and failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children pursuant to section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)) (count IV).

¶ 17    On November 9, 2023, DCFS filed a report that revealed on July 16, 2023, Jena gave birth to an eighth child (Archer). There was concern that Jena was a flight risk due to statements she made at the hospital. Archer was taken into care in Iroquois County. Asher had been in protective care 1178 days; Abigail had been in care for 745 days. DCFS noted that from the time visits resumed in April 2023 to the present, Asher and Abigail had a difficult time readjusting to visits. Both children were exhibiting behavioral issues. Asher and Abigail were having visits once a week for one hour. Visits returned to DCFS in October 2023. DCFS noted that Jena was still on supervised release and could not be alone with the children, unless in the presence of an approved third party, according to her parole officer, which was different from what Jena told DCFS. Jena would remain on supervised release until September 2024. DCFS noted that Jena did not tell them about her pregnancy with Archer, stating she was not legally responsible to do so. There was still some strife at visits so a second Addus worker was required to attend to neutralize the situation. DCFS obtained a consent to receive Jena's counseling reports from Anthony Brooks but had not yet received anything. On November 15, 2023, the trial court issued a permanency order finding Jena made reasonable efforts in returning her children but had not made reasonable and substantial progress toward that same goal. The order noted that "visitation not progress[ed] beyond agency supervised, must maintain honesty and communication with agency." The goal remained return home in 12 months. Following this ruling, the court moved to the fitness hearing.

¶ 18   At the beginning of the fitness hearing, the State asked the court to take judicial notice of the orders issued in both Asher and Abigail's cases. No objection to the request was presented and the trial court stated it would do so. Testimony was provided by Michelle Buckle, who was a childcare specialist at DCFS for six years and was assigned to this case in September 2021. At that time, Abigail had been born, but the agency did not yet know that. She remained the caseworker until June 30, 2023. When she took over the case, Jena's services included: "[i]individual counseling, mental health assessments and psychological evaluation, parenting, and following rules of parole." The parents were receiving approximately 9 or 10 hours of visitation each week when Ms. Buckle started the case. The amount of visitation changed after the visitation suspension in the summer of 2022. Visits were reinstated, in November 2022 by agreement with the attorneys, at one hour a week plus one hour a week for make-up time for a total of two hours a week.

¶ 19   Ms. Buckle testified that the visitation suspension stemmed from altercations during visits on July 6 and July 7, 2022. Following those incidents, the visitation location was moved to the Champaign Police Department. On July 13, 2022, there was a severe altercation with the Addus worker and visitation was suspended. The visitation resumed November 20 or 22, 2022. Ms. Buckles testified that additional anger management classes were not required but individual counseling was.

¶ 20   Ms. Buckle testified that the last report she received regarding Jena's counseling was July 2022 when Jena revoked her consent. In November 2022, Jena said she never revoked her consent, but the counselor, Ms. DiBello, stated there was no consent in the file and therefore continued to refuse to speak with the agency. Ms. Buckles sought to obtain a consent through Jena's lawyer but was unsuccessful. When she ceased being the caseworker in June 2023 there was still no consent

8

in the file. She was unable to confirm for a full year that Jena was participating in counseling, even though her services required it.

¶ 21    Ms. Buckle witnessed three visitations and stated they were positive; the parents brought food and gifts for the children. As for communication, Ms. Buckle was able to communicate directly with the parents until August 2022, at which time Jena told her to communicate with her attorney instead. She stated that both parents completed their parenting classes prior to the birth of Abigail. She confirmed that no additional parenting classes, or any amendment to the service plan, were made after Abigail's birth.

¶ 22    On cross-examination, Ms. Buckle stated that from July 2023 to November 2023, she would send and receive emails regarding visitation with the parents who continued to disagree with the rules for visitation. After Steven's visitation was suspended on December 22, 2022, Jena was offered visitation but chose not to attend the next two visitations and told the Addus worker to "lose her number." Jena required the agency to speak solely with her attorney and her visits did not resume until March 2023. Ms. Buckle confirmed that she was not aware that Jena was undergoing counseling until the permanency hearing held earlier that morning. She further indicated that she was unaware of the parents moving from Champaign, Illinois, to Thawville, Illinois, until the agency received the information from Jena's parole officer because Jena's attorney would not provide the information. On redirect, Ms. Buckle confirmed that parental cooperation was required, which included providing consents and advising of new addresses.

¶ 23    Following Ms. Buckle's testimony, the hearing was adjourned and continued to a future date. On April 15, 2023, the State filed a second supplemental motion for a finding of unfitness that contained an additional count (count V) alleging that both parents were unfit persons within the meaning of section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022))

because they failed to make reasonable progress toward the return of the minors to them during any nine-month period following the adjudication of neglect or abuse, namely July 12, 2023, through April 12, 2024. Counsel for the parents objected to the supplemental petition arguing that no discovery regarding that period ever occurred. The trial court took the matter under advisement.

¶ 24 The fitness hearing continued on April 26, 2024. On that date, testimony was provided by Rebecca Denning, Brooke DiBello, and Judy Osgood. Rebecca Denning worked for Addus for 29 years. She explained that Addus was a subcontractor of DCFS used to facilitate visitations. She was present at the visit on December 21, 2022, when Steven acted out at the Champaign Police Department. She stated that visits were moved to the police department after Steven acted out with the security guard at DCFS. She addressed the incident in December 2022 and the Addus rules. She stated that during Steven's December 21, 2022, incident, he was screaming that they were "f*** b***," "a bunch of c***," and that he "hated DCFS" in front of Jena, the Addus personnel, and his two-year-old son, Asher. Visits were eventually moved out to a church and there were three incidents involving Steven at those visits when he again acted out. Those occurred at the end of 2023 and beginning of 2024. Ms. Denning testified that her job with Addus did not include counseling the parents; she explained that her job was to ensure that the parents' behavior was appropriate in front of the children. She confirmed that when she shut herself in the room with Steven in December 2022, she was trying to keep his language from being heard by children at the police station and she was not afraid to be in the room with him.

¶ 25 Brooke DiBello testified that she was a licensed clinical professional counselor at Carle Health and worked there for 20 years. She worked with Jena from December 2020 to September 2022. Jena signed consents to allow DCFS to have access to her records but revoked the consents a couple of times. Jena was diagnosed with post-traumatic stress disorder and borderline

personality disorder. Jena never told Dr. DiBello that she was pregnant. When asked about how she handled the birth of Abigail, objections were raised because she was talking about a time frame before the periods alleged in the petition. The court stated, "[T]he larger issue is that the Court is saddled with the responsibility of determining, at the end of all the evidence, whether or not these parents have made progress to extent that—again, reasonable progress to the it's *** set forth in the various petitions that have been filed. And the progress has to be measured by the actual progress from the starting point, so to speak, when the dispositional order was entered." The court then quoted the dispositional order, "The Court further finds that both Respondent Mother and Respondent Father continue to repeatedly engage in behavior which demonstrate that the effects of their mental illnesses currently prevent them from safely caring for the minor." The court stated it was "going to allow the question to be asked and answered regarding potentially any behaviors by this parent or [Steven], again, which speak to the issue of whether or not their mental illness prevents them from safely caring for the minor. And, of course, based on that, whether they made progress in that during the relevant time periods."

¶ 26     Ms. DiBello stated that Jena was proud that she was able to take care of Abigail for the first month and wanted to show DCFS she was capable of doing so; however, Ms. DiBello also believed that Jena should have been up front with DCFS about the birth of the child and thought it was bad judgment to try to hide it from the agency. She testified that she was concerned about Jena in 2021 when she threatened to blow up the DCFS agency and therefore she contacted the agency about the threat. Ms. DiBello believed it damaged her relationship with Jena by reporting the statement because it damaged the trust level. She believed that she and Jena repaired the relationship. However, Jena interjected during the testimony and said, "Nope." Ms. DiBello stated that the last months of her therapy with Jena coincided with the suspended visitation. She received

11

an email from Jena in October 2022 that she was seeking a Christian counselor, and in November 2022, Ms. DiBello prepared a final report. She believed it would be beneficial for Jena to continue counseling when she ended the sessions.

¶ 27 Ms. DiBello confirmed that she initially had Jena's consent to talk to DCFS, but Jena revoked the consent after her visitation was suspended. Thereafter, Ms. DiBello would prepare reports and provide them to Jena to take to court instead of providing them to DCFS. She also recommended parenting therapy, but it did not occur. She stated she was qualified to ask how a borderline personality disorder would affect parenting but could not answer the question as to Jena because she never saw her parenting skills. She explained that DCFS agreed with the filial therapy, but transportation was an issue.

¶ 28 After Abigail was born there were issues with the lack of information provided to DCFS. Ms. DiBello's "primary concern at the time was that they were traveling from home to home, and the *** lack of stability, but it did appear that she was caring for her." The consent was revoked around August 2022. She was aware of the parenting assessment performed by Dr. Osgood. Ms. DiBello recommended the assessment to evaluate Jena's skills as a parent. Ms. DiBello's final assessment in November 2022 indicated that "overall, she had made progress. Slow progress, but based on diagnoses and multiple factors, that was—that was still progress. I think it would have been beneficial had she continued." Ms. DiBello clarified that Jena and Steven were moving around following Abigail's birth and were staying with friends during that time to "evade DCFS." She stated that Jena's goals were "were basically to improve ability to identify, regulate, and express emotions constructively, improve distress tolerance skills, increase interpersonal effectiveness, cope with the separation and loss from her children." She agreed that Jena never invited her to attend the visitations with the children.

12

¶ 29      Dr. Judy Osgood was qualified to testify as an expert. She testified that she was a licensed clinical psychologist for 36 years. She had a contract with DCFS for 25 years. She met with Jena on August 4, 2021, for a psychological evaluation and a parenting assessment. Dr. Osgood prepared reports following the meetings. Steven's attorney objected to the submission of this report on the basis of hearsay relied upon in the report, that the report was more prejudicial than probative, and the best evidence rule because Dr. Osgood was there to testify, and the 15-page report was not needed. After the court overruled those objections, counsel also added an objection of relevance stating that the report was not within the named time periods. Jena's attorney also objected on the same basis. The court admitted both documents.

¶ 30      Dr. Osgood stated that Jena "was extremely angry about the evaluation process, just having to meet with me, very argumentative. Didn't understand why she was doing it, didn't want to do it." So, they talked about consent early in the meeting and she eventually received Jena's consent to perform the evaluation. She did not believe that Jena was truthful about her mental health status because she had seen reports that included both suicidal and homicidal threats. She did not perform a lot of tests due to the fact that Jena was denying everything. She eventually diagnosed Jena with "[b]ipolar disorder with psychotic features, post-traumatic stress disorder, autism spectrum disorder, neurodevelopmental disorder associated with prenatal alcohol, drug exposure, and parent-child relational problem."

¶ 31      As to the parent-child relational problem, Dr. Osgood explained that "had to do with concerns regarding her behavior." She noted Jena's behavior during visits and stated Jena had difficulty stabilizing her mental health at a level sufficient to parent her child. She also noted Jena's "difficulty understanding how her mental health and these behaviors were affecting her ability to parent and affecting her son when there were incidents in front of him." Dr. Osgood's parental

13

assessment was based on a two-hour visit between Jena and Asher. Based on the parental evaluation, Dr. Osgood stated it was her opinion that Jena

"never demonstrated the ability to *** safely parent any child, and that she's had several. And that her mental health was a serious concern. That she *** had untreated mental health disorders. She was not on medication. She was in counseling but making suicidal and homicidal statements and ideations that *** [Jena] wasn't really taking seriously or addressing. So, it was my opinion that she's never demonstrated the ability to safely and responsibly parent a child. And that *** she hadn't made the progress or maintained stabilization to indicate anything really changed."

¶ 32     When asked what parenting strategies or interventions may assist Jena, Dr. Osgood stated, "that due to the severity of Jena's mental disorders, recent suicidal and homicidal ideations and threats, that she needed to be considered at high risk of harm to her son if he was left unsupervised in her care." She was also concerned about Jena being a flight risk. She did not believe that Jena would be able to cope with parenting challenges and keep her child safe. This was due to "her chronic, untreated mental disorders, her chronic instability regarding her mental health, her inability to work with, certainly, providers for the child, visit supervisors, medical staff as well." She was also "very concerned about [Jena's] untreated bipolar disorder with no medication, recent reports of homicidal and suicidal ideations."

¶ 33     Dr. Osgood stated that bipolar disorder came with huge risk factors, especially if the patient was not on medication and not really addressing those issues. She was also concerned with Jena's history and her failure to acknowledge the impact of her mental health on her struggles with parenting her children. Dr. Osgood stated:

14

"[T]here was really no acknowledgment of that or insight. And I felt part of that had to do with her mental disorders, her autism disorder, neurodevelopmental disorder, and untreated bipolar disorder, that I was extremely concerned about her mental health and the impact on any child being alone with her."

¶ 34 On cross-examination, she testified that she had previously examined Jena for purposes of a Social Security disability claim in March 2019. At that time, she diagnosed Jena with "neurodevelopmental disorder, autism spectrum disorder, bipolar one disorder, most recent episode, depressed, severe, post-traumatic stress disorder, and parent-child relational problem." She did not have a borderline personality disorder at that time. The evaluations were different because Jena was cooperative in 2019. She agreed that a more current evaluation would be helpful in determining Jena's current mental health situation.

¶ 35 Following Dr. Osgood's testimony, Steven's counsel argued that in *In re D.L.*, 191 Ill. 2d 1 (2000), the Illinois Supreme Court held that reasonable progress required "the trial court [to] limit its consideration to the statutory time period following the adjudication of neglect or abuse or dependency" and noted that much testimony was based on evaluations prior to that period. The court stated there was also "case law that speaks to evidence that may fall outside the nine months that may speak to court findings that need to be made regarding the nine months" but that it would review the *D.L.* case and if any changes to its decision needed to be made, it would be made at the next hearing.

¶ 36 The final day of the fitness hearing was held on June 7, 2024. Testimony was provided by Tracy Stine, Lynn Manning, and Donald Manning. Respondents' counsels again objected to the State's supplemental petition but admitted that discovery was provided since the prior objection.

15

The court also addressed *In re D.L.* and stated it believed its prior ruling was proper due to the necessity of determining the starting point to determine whether progress was made.

¶ 37    Ms. Stine testified that she was an Addus family support specialist. In this position, she takes children to visitation and documents what occurred at those events. She worked for Addus for 18 years. She was the visit supervisor when the case opened in 2020. In the beginning, Jena's father was present, and the visits were at home. Thereafter, the visits moved to the grandparents' home and eventually moved to Jena and Steven's apartment. From there, the visits went out into the community. They were held at First Christian Church and the mall. From there, the visits moved to the DCFS office and that was where they were held when Abigail was born. Later, the visits moved to the Champaign Police Department. She stated that there were rules at Addus that parents were required to follow for visitation and Jena was advised of those rules. She stated that she and Jena signed the rules in February 2022. In April 2022, the parents had about 10 hours of visitation a week and the visits were at the DCFS office. The visits were moved to the police department on July 13, 2022.

¶ 38    She explained that on July 6, 2022, there was an incident when Ms. Stine received a phone call from her mentally challenged son; she needed to leave early to get home to him, so he was not alone for the family emergency. Jena and Steven's visit ended after only an hour or hour and a half had passed. Ms. Stine took the children back, stating she did not have time to get someone else there to cover the visit. When she told the parents that she needed to leave for a family emergency, "[b]oth parents became upset, told me that it was not acceptable to end a visit because of the family emergency. A dying dog did not, you know, warrant ending the visit. And I explained to them it wasn't *** just the dog, I needed to get to my son."

16

¶ 39    Ms. Stine stated that the parents would find movies to watch on their phones. She would remind the parents that cell phone use violated the rules, but they did it anyway. She stated there were times between April 2022 and January 2023 that the parents were offered make-up visitation time, but they declined the offers due to Steven's work and sleep schedule. Occasionally, the parents would make or take phone calls from their attorneys or call Jena's parents. She would remind them they could not be on their phones, and they would say it was an "important call."

¶ 40    Ms. Stine stated that on May 25, 2022, an issue arose because Asher had diaper rash. Jena became defensive and stated that Ms. Stine was blaming them when it was the foster parent's fault. Ms. Stine told Jena that regardless of fault, the child's diaper needed to be changed. Despite the statement, the diaper was not changed right away because Jena and Steven debated who was going to change the diaper. She stated that cussing was an issue anytime the parents got agitated. This would happen at about half the visits and the children would be around when it happened. Jena also became upset at that visit because a caseworker asked her if she was pregnant. She then used foul language toward the caseworker. Ms. Stine also told Jena that she wondered if she was pregnant too and Jena accused her of spreading rumors and denied being pregnant. A few months after that, Abigail was born.

¶ 41    At the first visit at the police station, Steven was upset where Ms. Stine parked because she had to cross a busy road, and he yelled at her. The agitation continued and Jena said she was going to record the visit, and Ms. Stine told her she could not because it was against the rules. They said they could record the visit, and Ms. Stine called her supervisor and ended the visit. She asked her office to send an officer because Jena and Steven told her she could not end the visit, and they had the children. They called her a vulgar names and repeatedly used "the F word" during the rest of the visit. Visits were then suspended for a few months. A meeting was required, and Jena would

17

not have a meeting with DCFS without her lawyer and therefore the visits did not resume until November 2022 and those were also at the police station. Due to the previous incidents, two caseworkers were required to be present because there was too much cussing and too many incidents. Rebecca Denning was the other worker present, and she was Ms. Stine's supervisor.

¶ 42    Ms. Stine testified that there was another incident in December 2022. That occurred because she told the parents they had 15 minutes left. She explained that during that period, the parents were supposed to start cleaning up, put on coats, and walk to the car. Steven accused her of cheating him on his time with the children. She tried to explain that the time included the goodbyes, but he became agitated and started using "the F word." He said they were all going to lose their jobs and called her expletives. She noted that Jena stayed calm and was allowed to leave with Asher and Ms. Stine. Her supervisor stayed in the room with Steven to make sure he did not follow, and two officers escorted Jena and Ms. Stine to the car to ensure Ms. Stine and Asher could leave safely. Visits in November were only an hour of regular time and one hour of make-up time. Although Steven's visitation was suspended following that incident, Jena was allowed to have visitation but did not attend. At the end of February 2023, Jena began visiting without Steven. Those visits were one-hour regular time and one hour of make-up time. All the 2023 visits were only one day a week.

¶ 43    Ms. Stine testified that after Abigail was born, Jena would puree food for Abigail. When Ms. Stine would state that the chunk was too big for Abigail, Jena would just take it out and then feed the rest to Abigail, who had digestive issues. She stated there were times from April 2022 to November 2022 that the parents were able to redirect the children when they misbehaved but they were inconsistent with their redirection.

18

¶ 44    On redirect, Ms. Stine clarified that the movies would begin at the start of the visit, both children would watch, and then Asher would cry when it was shut off. One of the movies was Jurassic Park because Asher like dinosaurs, but he was only three years old, and Ms. Stine was concerned about the violence in the movie. Another concern stemmed from the movie A Nightmare Before Christmas. It was not a child rated movie. When she expressed concern to the parents, they would usually disagree with her but turn it off.

¶ 45    She testified that in addition to concern about some of the candy, she was also concerned about the breast milk that Jena brought because it changed color and ended up looking like watered down cow's milk. She stated that Jena previously supplemented her breast milk with cow's milk with Asher. This was a concern with Abigail because generally an infant was not provided cow's milk until they were a year old because they would be on formula or breast milk. She stated that the diaper rash issue was due to Asher being transported an hour and a half before the visit. She said the parents argued about who would change him for about 30 minutes before the diaper was changed. When she would give parenting advice or redirect, they would get agitated and begin cussing at her and calling her names. Both parents would use loud voices and vulgar language. Both have said that Ms. Stine "did not know who she was messing with" or that "she was messing with the wrong person."

¶ 46    As to the length of time for Asher's travel, Ms. Stine stated that the parents could have traveled to Asher in Springfield but declined to do so because of Steven's job. In addition to the content, Ms. Stine also testified that the movies were not the type of activities they wanted to see between the parent and child. After Ms. Stine's testimony, the State rested. The parents requested a directed verdict on all counts. The court granted the request as to counts II and IV.

¶ 47 Following this decision, testimony from Jena's parents was provided and Jena's mother testified about attending some of the visits for the last hour and Jena and Steven acting appropriately at that time. Lynn did not get to see Abigail as much. She thought Jena could apply what she learned in parenting classes and said that she and her husband would be a part of their grandchildren's lives. She had no concerns about Jena's ability to care, love and keep the children safe. She testified that Jena had more control over her emotions. She also gave her version of the July 6, 2022, incident and said it happened with 45 minutes left in the visit. She said the security guard was rude. He kept telling them they had to leave and then Steven and the security guard got confrontational and called each other names. She said they were both very intense and their eyes were locked. The security guard had his hand on his gun. The testimony by Jena's father about Jena's ability to rear her children was similar to that of his wife.

¶ 48 Closing arguments were presented on July 19, 2024. The court took the matter under advisement and issued its decision on August 14, 2024. The court noted its previous dispositional orders as to each child. As to Asher, it found on December 20, 2020, "the respondent mother had a lengthy and significant history of mental illness and *** a history of being in abusive and violent relationships." As to Abigail, the court found on October 4, 2022, "that both respondent parents continued to repeatedly engage in behaviors which demonstrate that the effects of their mental illnesses currently prevent them from safely caring for the minor." The court noted that the conditions that existed when Asher was removed continued to exist when Abigail was taken into care. "In both cases, it is the parents' struggle to manage their behaviors and decision making in light of their mental health diagnoses that is at the heart of why we're here today." The critical issue was whether Jena made sufficient progress in the management of her ongoing mental health issues, so she was able to safely parent her children on her own. It noted that under the objective

20

standard, handicaps were not addressed, and therefore, "mental illness, which certainly qualifies as a handicap or difficulty peculiar to these parents, will not be a legal defense to the claim that a parent has failed to make reasonable progress as defined by the statute." The court noted the parents' compliance with their services, "for the most part."

¶ 49 The court referred to Jena's reliance on only speaking through counsel with DCFS and revocation of her consents and found those were poor decisions that led the court to find that Jena's "unusually deep-seated and pervasive mistrust" of DCFS "was clearly a byproduct of her ongoing mental disorders and not just a result of a few bad experiences." The court found "the parents' mental illness fueling their *** intractable mistrust towards everyone around them is going to be a running theme" in the case. The court noted that Jena completed most of her services but stated, "despite completing services designed to address the parents' deficiencies, the actual behavior of the parents revealed that they had great difficulty applying what they learned into their actual parenting and decision making." It provided examples, including hiding Abigail's birth resulting in a loss of visitation with Asher. After addressing other arguments raised in closing arguments, the court found that the State proved that Jena failed to make reasonable progress during either period alleged by the State.

¶ 50 The best interest hearing was held on September 18, 2024. On September 19, 2024, the court found it was in the best interest of both children to terminate Jena's parental rights. Jena timely appealed.

¶ 51                                          II. ANALYSIS

¶ 52 On appeal, Jena argues that the trial court abused its discretion in admitting Dr. Osgood's psychological and parenting capacity assessment reports and considering testimony from Dr. Osgood and Ms. DiBello that were related to time periods prior to the two nine-month periods

21

specified by the State. She concedes that she failed to perfect the second issue for review and, therefore, requests plain error review as to the testimony. She also contends that the trial court misapplied section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)) and erred in finding that she did not make reasonable progress toward the return of the children.

¶ 53                                    A. Admission of Evidence

¶ 54    The rules of evidence applied in civil cases also apply to parental rights termination proceedings. *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998). "The circuit court's decision to admit or deny evidence during a parental rights termination hearing is reviewed under an abuse of discretion standard." *In re J.B.*, 346 Ill. App. 3d 77, 80 (2004). An abuse of discretion requires this court to determine whether the trial court acted arbitrarily without the employment of conscientious judgment or, after considering all the circumstances, "exceeded the bounds of reason and ignored recognized principles of law," resulting in substantial prejudice. (Internal quotation marks omitted.) *Id.*

¶ 55    Jena contends that the documentary evidence consisting of Dr. Osgood's parenting capacity and psychological evaluation reports was not relevant as defined by Illinois Rule of Evidence 401 (eff. Jan. 1, 2011) and, even if relevant, was more prejudicial than probative pursuant to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011).

¶ 56    Therefore, the first issue is whether the evidence was relevant. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence is generally admissible; however, irrelevant evidence is not admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Given that the underlying basis of the court's removal of Asher was Jena's mental health issues, no reasonable argument can

22

be made that the report stemming from a psychological evaluation performed to determine Jena's mental health issues was not relevant. Similarly, whether Jena had ability to parent her children is equally at issue. A report prepared to address Jena's parenting capacity is equally relevant. While the reports involved a period outside that chosen by the State, it is the only evidence regarding Jena's ability to parent performed by a professional. Accordingly, we hold that the evidentiary requirements of Illinois Rules of Evidence 401 and 402 were met.

¶ 57    Therefore, the second issue becomes whether the evidence was more prejudicial than probative. "[R]elevant[ ] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Here, Jena argues that admission of the reports "was almost exclusively and substantially prejudicial"; however, no rationale for the argument was presented.

¶ 58    "All evidence is prejudicial in the sense that it compels the factfinder in one direction or the other"; the issue posed by the rule allowing the exclusion of relevant evidence whose probative value is substantially outweighed by the danger of unfair prejudice is when the evidence becomes unfairly prejudicial. (Internal quotation marks omitted.) *People v. Reichert*, 2023 IL App (5th) 180537, ¶ 111. " 'Unfair prejudice' is a term that ' "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." ' " *Id.* (quoting *People v. Parker*, 335 Ill. App. 3d 474, 487-88 (2002), quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

¶ 59    Here, while Dr. Osgood's report was unflattering, it was not admitted for the purpose of determining the outcome of the case. As noted by the trial court, the report showed a baseline of Jena's mental health issues and ability to parent prior to the periods specified by the State. Nor is

23

there any evidence in the record to support a claim that the trial court was lured into finding Jena unfit based on the report. In fact, the record reveals the opposite. The trial court's determination was based on actions, or inactions, taken by Jena during the requisite periods. As no real claim of prejudice was presented, we cannot find that admission of Dr. Osgood's psychological evaluation and parenting capacity reports was more prejudicial than probative.

¶ 60   Jena also argues on appeal that allowing Ms. DiBello and Dr. Osgood to testify about her mental condition for a period prior to the State's alleged periods was erroneous. Jena concedes that no objection to the testimony was raised during the hearing and therefore requests plain error review.

¶ 61   Plain error review is allowed for claims under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 (West 2022)). *In re M.W.*, 232 Ill. 2d 408, 431 (2009). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "[T]he first step in plain-error review is to determine whether an error occurred." *M.W.*, 232 Ill. 2d at 431.

¶ 62   Here, while Jena contends that allowance of Dr. Osgood and Ms. DiBello's testimonies was in error, no argument was presented as to whether the alleged error should be reviewed under either the first or second prong of plain error review. Equally deficient is any clear argument as to why the allowed testimony was in error, beyond the fact that the testimony referenced a period prior to the periods alleged by the State and an uncited claim that because Dr. Osgood was

24

classified as an expert witness, her testimony "carried considerable weight." As noted above, we cannot find that allowance of either professional's testimony was erroneous as the testimony provided a baseline to determine whether Jena made progress during the requisite periods. As no error can be found, plain error—whether under the first or second prong—is inapplicable.

¶ 63                                    B. Finding of Unfitness

¶ 64    Jena also argues that the trial court erred in its application of section 1(D)(m)(ii) by considering evidence that was not limited to the requisite periods. She further argues that the trial court's finding of unfitness was against the manifest weight of the evidence.

¶ 65    As to the initial argument, this court reviews whether a trial court misapplied the law *de novo. In re Marriage of Vondra*, 2013 IL App (1st) 123025, ¶ 9. Here, Jena argues that the trial court misapplied section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 66    Section 1(D)(m)(ii) states that an

" '[u]nfit person' means any person whom the court shall find to be unfit to have a

child, without regard to the likelihood that the child will be placed for adoption.

The grounds of unfitness are any one or more of the following ***: *** Failure by

a parent *** to make reasonable progress toward the return of the child to the parent

during any 9-month period following the adjudication of neglected or abused minor

under Section 2-3 of the Juvenile Court Act of 1987 ***. If a service plan has been

established as required under Section 8.2 of the Abused and Neglected Child

Reporting Act to correct the conditions that were the basis for the removal of the

child from the parent and if those services were available, then, for purposes of this

Act, 'failure to make reasonable progress toward the return of the child to the

parent' includes the parent's failure to substantially fulfill his or her obligations

25

under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987." *Id.*

¶ 67   This section of the Act was interpreted by our Supreme Court stating,

"the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 68   The court found that the critical issue was whether Jena made sufficient progress in the management of her ongoing mental health issues so that she could safely parent her children. The court's decision did not rest on the reports and testimony of Dr. Osgood or Dr. DiBello. Instead, the court relied on the reports only to establish a baseline to gauge Jena's progress. It also noted the doctors' testimony with respect to Jena only speaking through counsel with DCFS and revocation of her consents and found those were poor decisions that led the court to find that Jena's "unusually deep-seated and pervasive mistrust" of DCFS "was clearly a byproduct of her ongoing mental disorders and not just a result of a few bad experiences." The court's ultimate determination of Jena's progress relied on the fact that completion of the service plan did not equate to comprehension of the skills provided in the services and Jena's actions during the period stated in the petition that demonstrated her failure to implement what she learned and her ongoing mental health issues. As such, Jena's argument that the court misapplied section application of section 1(D)(m)(ii) is meritless.

26

¶ 69    Jena also argues that the trial court's findings of unfitness were against the manifest weight of the evidence. We again disagree.

¶ 70    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental rights termination. See 705 ILCS 405/2-29(2) (West 2022). "The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018))." *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27.

¶ 71    Here, the record is replete with instances of Jena's refusal to abide by the portions of the service plan that mattered most. For example, she revoked her consent that would allow DCFS to monitor her counseling progress. She also hid her pregnancy with Archer in an attempt to evade DCFS, refused to communicate directly with DCFS, and failed to participate in visitation with Asher and Abigail when offered. The results of her actions, as well as Steven's, ultimately resulted in a reduction of visitation time from approximately 10 hours a week to one hour a week with an extra hour to "make up" the missed visits. These actions cannot be interpreted as objective manifestations of progress, when the actions are, instead, indicative of regression. Accordingly, we affirm the trial court's findings of unfitness.

¶ 72    After a trial court finds the parent unfit, the cause proceeds to the second step and the trial court determines whether it is in the best interest of the child to terminate parental rights. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1071 (2006). At this proceeding, the "issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The focus

shifts to "the child's interest in a stable, loving home life." *Id.* A court's best interest finding will not be reversed unless it is contrary to the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 73 Jena's notice of appeal included both orders. However, on appeal, no argument was presented regarding the trial court's best interest findings or the order terminating her parental rights. Accordingly, the issue is forfeited. See *People v. Pizzo*, 2022 IL App (2d) 210073-U, ¶ 108; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Accordingly, we affirm the trial court's order terminating Jena's parental rights.

¶ 74                                  III. CONCLUSION

¶ 75 For the above-stated reasons, we hold that the trial court did not abuse its discretion in allowing Dr. Osgood's reports, or the testimonies of Dr. Osgood and Ms. DiBello. We further hold that the trial court did not misapply section 1(D)(m)(ii) of the Adoption Act and that the court's order finding Jena unfit was not against the manifest weight of the evidence.

¶ 76 Affirmed.